In re Involuntary Termination of
Parental Rights to E.M. and
R.M., Minors.

Appeal of P.F., Biological Mother.

In re Involuntary Termination
of Parental Rights to
E.M., A Minor.

Appeal of E.M., Minor.

Superior Court of Pennsylvania.

Submitted July 24, 2006.
Filed Sept. 11, 2006.

Shannon S. Piergallini–Smith, Allentown, for P.F.

Richard P. Focht, Orefield, for E.M. and R.M.

Lisa A. Miller, Allentown, for Lehigh County Office of CYS, Participating Party.

BEFORE: HUDOCK, STEVENS and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 P.F., natural mother, appeals from the February 24, 2006 Order terminating her parental rights to her minor children, R.M., born September 21, 1990, and E.M., born November 15, 1991. Minor child E.M. also appeals from the Order.[1] The two cases have been consolidated for our review.

¶ 2 The factual and procedural history of the case is as follows. On April 22, 2003, the children were placed with the Lehigh County Office of Children and Youth Services (CYS), after police took emergency custody of them due to mother's arrest for assaulting her 17–year–old stepson.[2] N.T., 10/7/05, at 12, 15. With neither parent present, the children were adjudicated dependent on May 1, 2003. *Id.* at 12. Mother alleged she was in a car accident on the way to the May 1st hearing and requested a rehearing, which was held on June 12, 2003, after which the children were again adjudicated dependent. *Id.* at 14, 16, 49. The permanency plan at that time was "return to home" and the court ordered a 60–day review in anticipation that the goal would be realized by that time. *Id.* at 16–

---

1. Natural father, (E.M., a.k.a. A.L.) whose rights were also terminated as to both children, did not file an appeal. Since father is not a party, the initials E.M. as hereinafter used in this Opinion, refer only to the minor child. Minor child R.M. is an appellee in both appeals and takes the position that the Order terminating mother's parental rights is supported by clear and convincing evidence.

2. Mother pled guilty to the criminal charges stemming from the incident and was sentenced to probation. N.T., 10/7/05, at 110–111. We also note the family's history involved "domestic violence and Children and Youth involvement in other states and counties, mental health problems; criminal issues." N.T., 10/7/05, at 15. Mother has been arrested several times, for aggravated battery, false identification, resisting arrest, possession of an instrument of crime, defiant trespass, and traffic offenses. *Id.* at 16. Children and Youth Services of Monroe County, Florida, was involved with mother for "issues related to threatening her children, physical discipline, aggravated battery, and family violence." *Id.* at 15–16. Children and Youth Services of Monroe County, Florida filed for dependency but mother moved to California and subsequently in that state, her parental rights were terminated as to four children. *Id.* at 16, 50.

17. Mother was ordered to complete a psychological evaluation and follow through with all recommendations of the evaluator, resolve her criminal issues and activities, obtain housing and a legal source of income, participate in counseling as well as any other of CYS's recommendations, including anger management and domestic violence classes. *Id.* at 17. She was granted liberal phone contact with the children and supervised visitation, which could be increased in frequency as deemed appropriate. *Id.*

¶ 3 At the August 14, 2003 review hearing, the court concluded mother failed to comply with the psychological evaluation, failed to obtain housing and income, failed to remain arrest free, and failed to maintain contact with her children.[3] *Id.* at 20. Underlying the court's determination were the following facts. Since the prior hearing, mother moved from Allentown to Bethlehem, and then to a family shelter in Norfolk, Virginia, all without notifying CYS. *Id.* at 18. She had attended only six of eleven possible visits with the children. She had confirmed some of the missed visits, thus the children were taken to the place of the scheduled visit, yet she failed to appear, causing the children "grave disappointment." *Id.* at 20. Although granted two phone calls per week, she called only four times in the 60–day period. *Id.* at 18–19. Mother also was arrested on July 2, and spent six days in Lehigh County Prison for criminal contempt charges filed by father. *Id.* at 18. Mother initially refused to sign consent forms for her children to obtain counseling and other services through CYS, but finally complied on July 31, 2003. *Id.* at 19.

Mother made an appointment for the requisite psychological evaluation but failed to attend. *Id.* at 18, 54–55. The court ordered another six-month review hearing. In the interim, mother was to accomplish essentially the same objectives as previously had been established: complete a psychological evaluation and follow through with recommendations, obtain housing and income, resolve all her criminal charges, participate in counseling services, and maintain supervised visits with the children. *Id.* at 20–21.

¶ 4 Mother was present by phone for the next review hearing on February 12, 2004, at which time it was determined she again had failed to achieve all of the objectives set for her. She failed to resolve her criminal issues, and failed to obtain housing and income. *Id.* at 22–23. During this six-month period, mother did not maintain contact with the agency and the agency did not know her whereabouts. She reportedly had lived in Virginia, Louisiana, and California, and as of the hearing date, in Mexico, but did not have a permanent address. *Id.* at 22–23. She did not complete a psychological evaluation or counseling. Further, she did not attend a single visit with her children during this period, and was inconsistent in maintaining phone contact with them. *Id.* As a result, the goal was changed from return home to termination of parental rights for adoption. *Id.* at 23.

¶ 5 CYS informed mother of the goal change by letter in April 2004, and also informed her of the services in which she was to participate. *Id.* at 24. Mother, however, made no contact with CYS until

---

**3.** The CYS caseworker testified mother did not attend the August 14, 2003 hearing. N.T., 10/7/05, at 18. The testimony also indicated that at that hearing, mother requested weekend rather than weekday visitation, a request the court denied due to her lack of compliance to date, and she requested expanded time periods in which to call, a request the court granted. *Id.* at 20. It is unclear whether these requests were made through counsel who appeared for mother, or if she in fact did appear.

August 25, 2004, the day before the next permanency review hearing was scheduled to take place, when she called and informed CYS that she had an income, and was ready to come to Pennsylvania, visit with the children, and comply with services. *Id.* at 24–25. She was present by phone for the August 26, 2004 hearing and reiterated to the court that she intended to resume visitation with the children. *Id.* at 26. Also at that hearing, the court ordered that any phone calls between mother and children were to occur during the children's therapy sessions since her inconsistency in calling had negatively affected the children, and also because when she did call, she incorrectly informed the children that she did all she could but CYS still kept her from visiting the children, causing the children to act out against their foster mother. *Id.* at 25–26, 60–61. In addition, mother informed the court that she had open criminal charges in Florida. *Id.* at 28–29, 50, 54. The court ordered a three-month review hearing.

¶ 6 Mother did not attend the November 18, 2004 review hearing. She called that morning, at approximately 8:45 a.m., fifteen minutes before the hearing was scheduled, and requested a continuance, alleging she had the flu and was not thinking clearly. Her request was denied, *id.* at 28, and at the hearing, the court learned that despite mother's representations to the contrary, and despite CYS's continued willingness to arrange visitation for mother, mother did not appear for a single visit with the children. *Id.* at 26, 59–60. As for the requirement that mother undergo a psychological evaluation, mother provided her attorney with a letter indicating she had begun the evaluation. CYS sent letters to the psychologist in September and

October of 2004 requesting a copy of the evaluation but received no response.[4] *Id.* at 29. The court determined mother did not comply with any of the objectives set for her. *Id.* at 28. It was also learned mother was circumventing the requirement that she contact the children via phone during therapy sessions, by communicating with the children via email. *Id.* at 30–31. In addition, mother continued to be difficult for CYS to contact. The phone number she provided was not functional, and mail that was sent to the address she provided was returned to CYS. *Id.* at 32. Mother also provided an address of a home she acquired in Mexico through a divorce settlement. She did not live there, however. *Id.* at 29, 32. At the end of the hearing, the court ordered that mother comply with the same objectives that had been set repeatedly. *Id.* at 29–30.

¶ 7 CYS filed a petition for involuntary termination on February 7, 2005, and a final review hearing was held on May 5, 2005. *Id.* at 32–33. From November 2004 until that time, mother had not met any of the objectives. *Id.* at 32–33. In January 2005 she provided an address for her cousin's house where mother then lived, and at which she could receive mail. CYS learned from mother's attorney that mother intended to offer this cousin as a resource for the children so it sent two letters to that address indicating the steps mother's cousin could take to present herself as a resource, but it never received a reply. *Id.* at 32–33, 41–42. Also on May 5, 2005, CYS sent the person who completed mother's psychological evaluation documents from its case files, providing case history, and asked for any further recommendations based upon that information.

4. Ultimately, in February 2005, the court received a completed psychological evaluation. CYS could not recall anything significant about the evaluation, but noted it described mother as being "psychologically apt." N.T., 10/7/05, at 34, 55–58.

CYS never received a response. *Id.* at 34, 58.

¶ 8 A hearing was held on CYS's petition on October 7, 2005, and November 17, 2005. As of that hearing, mother had not seen the children since July 2003, and had only very sporadic, and often very brief, telephone contact with them. Sometimes months elapsed without her calling her children as scheduled. N.T., 10/7/03, at 19, 39, 45–46, 64. Mother also never sent a card, gift or letter to the children in the two and one-half years they had been in custody. *Id.* at 64–65

¶ 9 As for the children, we note R.M. was fifteen years old as of the October 2005 hearing, and E.M. was almost fourteen. They were in the same foster home where they had lived since only approximately a month after their initial placement. *Id.* at 70. This is not a preadoptive home, but their foster mother allegedly is willing to keep them until they reach the age of majority. *Id.* at 65–66, 70–71. The children indicated their preferred choices to CYS as follows: (1) return to mother; (2) remain in their current foster home; and (3) proceed with the adoption process. *Id.* at 67.

¶ 10 The court granted the petition as to both children, finding statutory criteria for termination were met pursuant to 23 Pa. C.S.A. § 2511, **Grounds for involuntary termination,** (a) **General rule,** (1), (2), and (8), and pursuant to Section 2511(b), **Other considerations,** best served the needs and welfare of the children.[5] Record Nos. 29, 31.

¶ 11 These timely appeals followed in which mother argues the statutory criteria of section 2511(a) were not met for the following reasons. First, in an apparent argument that CYS failed to meet its burden as to section 2511(a)(8), mother contends the conditions that led to the children's removal, allegedly her arrest and resultant incarceration, no longer exist. Also, she contends CYS cited as a basis for the children's removal domestic violence between mother and father, but she no longer has any relationship with father. Mother's brief at 16–17. Mother further contends she has complied with the requirements established by CYS. She completed a psychological evaluation, resolved her criminal charges, has suitable living arrangements, and is employed. *Id.* at 17–18. E.M. incorporates by reference mother's arguments regarding section 2511(a). We address these arguments before proceeding to mother and E.M.'s remaining

---

**5.** 23 Pa.C.S.A. § 2511, **Grounds for involuntary termination,** provides, in relevant part:

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the inca-

pacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) OTHER CONSIDERATIONS.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.

23 Pa.C.S.A. § 2511.

arguments relating to the section 2511(b) analysis of the children's needs and welfare.

¶ 12 "In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so." *Id.* (citations omitted). In such a proceeding, the focus is on the conduct of the parent. *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super.2004), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (citations omitted). Paramount, however, is that adequate consideration be given to the needs and welfare of the child. *In re J.I.R.*, 808 A.2d 934, 937 (Pa.Super.2002), *appeal denied*, 573 Pa. 672, 821 A.2d 587 (2003); *see also* 23 Pa.C.S.A. § 2511(b), **Other considerations** (providing, in pertinent part, that, "the court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child"). In evaluating the needs and welfare of the child, the court must consider whatever bonds may exist between parent and child. *In re Adoption of A.C.H.*, 803 A.2d 224, 229 (Pa.Super.2002).

¶ 13 In our review of the court's decision, we adhere to the following well-established legal principles:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.* at 383 (citations omitted). If competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super.2003).

¶ 14 We conclude, without hesitation, CYS met its burden of proving the statutory criteria for termination pursuant to section 2511(a). Section 2511(a)(1) provides, in pertinent part, that a parent's rights may be terminated if: The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition ... has failed to perform parental duties. 23 Pa.C.S.A. § 2511(a)(1). "Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super.2004).

¶ 15 As the above recitation of the case history elucidates, mother's actions in the six months immediately preceding the February 2005 filing of the petition for termination were no different than her actions beginning in July 2003. Mother concedes she never once visited her children since July 2003, but contends her lack of visitation is insufficient to support termination since she contacted her children by phone. She also concedes her telephone contact was erratic. Mother's brief at 20–21. According to her testimony, when she first left Pennsylvania, she tried to talk to her children eight times a month, but only succeeded, on average, four times per month. N.T., 10/7/05, at 119–120. Paul Rieger, a therapist who worked with

E.M. from September 2003 in weekly sessions, informed the court that supervised phone calls between mother and children began in July 2004, with mother to initiate the calls. *Id.* at 74–75. In the 55 weeks from July 22, 2004, until the October 2005 hearing, mother failed to make 31 of those scheduled weekly calls to her children. *Id.* at 75–77. There were also long gaps in between phone calls, e.g., there were no calls from April 21, 2005 until July 7, 2005.[6] *Id.* at 80. Mother emphasizes she maintained contact with her children via email. Mother's brief at 20–21. She argues she did not abandon her children and has made "every reasonable effort in her power to maintain contact with the children and remain important in their lives." *Id.* at 21–22.

> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

*In re B., N.M.* at 855 (citations omitted).

¶ 16 We have no difficulty in concluding that mother's email contact and sporadic phone contact were insufficient to meet this obligation. During mother's absence, R.M. grew from twelve to fifteen years old, and, as mother learned via email, R.M. was raped and/or engaged in consensual sex during this time. N.T., 11/17/05, at 18. Certainly, mother could not properly support her child during this critical time via email. Mother, through her physical and emotional absence, failed to support her children in times of crises, and also through their daily trials and tribulations. A review of the record leaves no question that since the children's removal, mother has failed to perform her parental duties.

■ ¶ 17 We also do not hesitate to conclude termination was proper pursuant to section 2511(a)(2), which provides a parent's rights may be terminated when:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). Mother had over two and one-half years to work toward reunification with her children. During that time, she was essentially absent from their lives. There is no question this caused the children to be without parental care, control and subsistence, and the children's foster mother provided those things in her absence. "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *In re B., N.M., supra* at 855. Mother argues the court must consider her explanation for her "apparent neglect." Mother's brief at 19–20; *see also In re B., N.M.* at 855 (stating "The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the

---

6. We note CYS filed the termination petition in February 2005. Record No. 1. Even though mother knew CYS was proceeding to terminate her rights to her children, she still failed to call them from April to July 2005. N.T., 10/7/05, at 83. In violation of the requirement that communication between mother and children be supervised, mother initiated and encouraged email communication between them. *Id.* at 88–89, 100–101.

circumstances, clearly warrants the involuntary termination.").

¶ 18 Upon review, we find mother's testimony was vague, rambling, frequently nonsensical, and her responses often non-sequiturs, but we will attempt to decipher it. Mother provided the following excuses for her failure to visit her children: she is not from Pennsylvania; she's from Mexico and was trying to get back there. Her husband was somehow getting her in trouble with the law. She made vague references to financial difficulties, a difficult economy and difficulty finding employment. She alleged her job, which she began in June 2005, did not provide her with vacation time. She made some apparently unrelated complaints about her ex-husband. She even somehow blamed the cold weather for her difficulties in contacting her children.

¶ 19 Mother also alleged she could not return to the U.S. because her purse, in which she kept her immigration documentation, had been stolen. It should be noted her purse allegedly was stolen in approximately April 2004, so this excuse does not account for the time prior to that. Also, when asked why she was not present at the termination hearing, she again blamed immigration issues, stating "I don't have a permit to go into the country," yet she had been to California in October 2005, when she participated in a hearing by phone, and also was there the week prior to the termination hearing. N.T., 10/7/05, at 115–119, 124–127; N.T., 11/17/05, at 14–17, 20–21, 25.

¶ 20 In addition we note that although mother claimed she had a very supportive family in Mexico, when asked why they could not help her purchase a plane ticket to see her children, which she claimed she could not afford, she responded her family was supportive "over here" (in Mexico). N.T., 11/17/05, at 17.

¶ 21 Perhaps most illuminating, when confronted directly as to why she failed to visit her children, mother explained, in sum, "Pennsylvania is ... not my place." She stated "I do not belong in Pennsylvania." N.T., 11/7/05, at 15–16.

¶ 22 Mother explained she missed more than half of the supervised calls during therapy sessions because the connections were bad, the calls were expensive, and she had conflicts with work. N.T., 10/7/05, at 120. She blamed work conflicts for her failure to call her children for the three-month period from April to July 2005. *Id.* at 122. She contends, however, it is "important to note" she is in a time zone three hours behind Pennsylvania. Mother's brief at 21.

¶ 23 Mother has attempted to explain her "apparent neglect" and claims she "has made every reasonable effort in her power to maintain contact with the children and to remain important in their lives." *Id.* at 19, 21–22. She also claimed to be "so worried" about her children. N.T., 10/7/05, at 13. The court found mother's testimony to be incredible. Record Nos. 29, 31, Adjudications as to R.M. and E.M., respectively, at 4, ¶ 16. "[B]because the trial judge is in the best position to observe the witnesses and evaluate their credibility, we accord great weight to his credibility determinations." *In re G.P.-R.*, 851 A.2d 967, 974 (Pa.Super.2004). We have no reason to set aside the court's credibility determination.

■ ¶ 24 We remind mother that

[t]his affirmative [parental] duty ... requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

... parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life'

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances.

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.

*In re B., N.M., supra,* at 855 (citations omitted).

¶ 25 Mother's chief complaints are the expense and difficulty of visiting and calling her children in Pennsylvania. When asked why she does not have her kids back she responded "Because the money reasons." N.T., 11/17/05, at 25. It was unquestionably more expensive for mother to visit or even call her children from Mexico, and it was likely more difficult to maintain contact due to the time difference, yet mother chose to *return* to Mexico when her children were in placement in Pennsylvania. In other words, mother erected the very barriers which she complains keep her from her children.

¶ 26 Mother has failed to live up to her parental duty. In a brief moment of lucidity, mother conceded it was her fault CYS had moved to terminate her rights. N.T., 11/17/05, at 22. We agree. CYS proved mother failed to perform parental duty for almost two and one-half years, and also proved mother's refusal or neglect caused the children to be without parental care, control, or subsistence, which had to be provided by foster mother.

¶ 27 We have addressed sections 2511(a)(1) and (a)(2). It is not necessary that we consider whether termination was proper pursuant to section 2511(a)(8). *See In re B.L.W., supra* at 384 (reiterating

that "we need only agree with its decision as to any *one* subsection in order to affirm the termination of parental rights.") (emphasis supplied). We now proceed to consider whether termination was proper pursuant to section 2511(b).

¶ 28 We begin this discussion by noting the prospective outcomes of this case. If mother's rights are terminated, then the children either remain in foster care, preferably in the foster home where they have been since just after placement with CYS, or CYS must try to find adoptive placement—to which the children must consent. If mother's rights are not terminated, CYS may continue to make futile attempts to reunite the children with mother, or may try to place them with another relative, though none has been identified, or the children will stay in foster care, again, preferably in the foster home where they have been living. N.T., 10/7/05, at 107–108.

¶ 29 Given the circumstances of this case, i.e., mother's continued failures in reuniting with her children, no relative has been identified for placement, their current placement is not a pre-adoptive home, the ages of the children as it relates to their prospects for adoption, and the fact that they must consent to adoption, and the fact that E.M. is appealing the termination, the reality is these children most likely will remain in foster care until they reach majority regardless of the outcome of this case. Mother concedes this is true. She contends,

Nothing in these children's lives will change if termination is granted. Nothing in their lives will change if termination is denied. These children will continue to live with their current caregiver with whom they are comfortable and with whom they may stay with until reaching majority. These children are very fortunate to have a caregiver who

is willing to keep them until such time as they reach the age of majority.

Mother's brief at 24–25.[7] She also emphasizes the children have expressed a preference to return to her and she does not believe they will consent to adoption. *Id.* at 23–24. In sum, mother argues that termination in this case will serve no purpose since it will result in the same physical arrangement as currently exists, but will make the children true orphans. *Id.* Mother alleges the children "currently have permanency to the fullest extent possible." *Id.* at 24. She suggests the best solution is the denial of the termination petition combined with the foster mother assuming a permanent legal custodianship of the children. *Id.* at 25.

¶ 30 E.M. reiterates that his first preference is reunification with his mother, his second preference is to remain in the foster home, and he would only consider adoption as a last resort. E.M.'s brief at 10. He does not want his mother's rights to be terminated because that would foreclose the possibility of reunification for the sake of "permanence." He notes the denial of the instant petition would allow reunification, continued placement, or if subsequent circumstances warrant, termination. *Id.* at 10–11. Most significantly, he argues denial of the petition is the best option, particularly considering that at his age, he can refuse to consent to adoption. *Id.* at 11.

¶ 31 As of trial in this case, R.M. was opposed to termination, reunification was her first choice, remaining in her current foster placement her second, and adoption her third. She did not appeal, however, and now takes the position that the court's decision to terminate was supported by clear and convincing evidence. R.M.'s brief at 2. She recounted the testimony of the CYS caseworker, Sharon Dunn, and that of her therapist, set forth in detail *infra,* which she indicates reflects her position.

¶ 32 Multiple witnesses testified as to the children's interests. The CYS caseworker, Sharon Dunn, testified both children have loyalty issues towards their mother and cannot move forward until a decision is made. They have been involved in the process of interviewing adoptive families and have created presentations about themselves for adoption purposes, but are reluctant to go forward until a decision is made in this case. N.T., 10/7/05, at 46–47. Dunn acknowledged that in a June 2003 Order, the court found the children were clearly bonded with mother. Dunn however believed this bond had not been maintained but the children remained loyal to their mother. Dunn felt any bond that remained was not healthy, the children's best interest would be served by severing it, and the court's decision to terminate mother's rights would allow the children to move forward with their lives. *Id.* at 63–64, 68–69, 71. Dunn believed termination served the children's best interests despite the fact that due to their respective ages, they could refuse consent to adopt. *Id.* at 72.

¶ 33 Paul Rieger, a therapist who worked with E.M. from September 2003 in weekly sessions testified. Rieger felt that out of loyalty to his mother, E.M.'s first choice is to reunite with her. He is very frustrated and will not discuss other options until there is resolution with mother. *Id.* at 81. He has mentioned, however, he

7. There was a suggestion as of November 17, 2005, that E.M. was removed from his foster home because his foster mother was afraid of him. N.T., 11/17/05, at 19. E.M.'s counsel, in his appellate brief, however, contends continued placement with the present foster mother is a viable option. E.M.'s brief at 10.

is very comfortable in the foster home and would stay there. He has also been involved in some of the adoption preparation activities, but again, does not want to pursue anything until there is a resolution with mother. *Id.* at 81, 92–93.

¶ 34 Rieger does not deny there is a relationship between E.M. and mother, but opines it has not grown since the separation, and if anything, had recently begun to deteriorate due to E.M.'s frustration with the situation. *Id.* at 82–83. Rieger believed that a decision, whatever it is, is in E.M.'s best interests, so that he can move forward. If termination were the decision, Rieger believed E.M. then would open himself up to other alternatives and further, that termination would not harm E.M. *Id.* at 84–85, 91. E.M. has indicated to Rieger, however, that if mother's rights were terminated and accordingly, there would not be contact between the two, he would not be happy about that. *Id.* at 90–91. In approximately March 2005, it was reported to Rieger that E.M. threatened to run away if his mother's rights are terminated. E.M. denied this to Rieger, however. *Id.* at 63, 89–90; N.T., 11/17/05, at 11–12.

¶ 35 Rieger conceded that if mother's rights were terminated, when R.M. and E.M. turn eighteen and "age out" of the system, they could reunite with mother. At that point, however, Rieger believed the children, who would have enjoyed "permanency" in their remaining juvenile years, would be better equipped to deal with their relationship with mother. *Id.* at 94.

¶ 36 Mindy Watson, the therapist who worked with R.M. since November 18, 2004, also testified. She described R.M. as being conflicted, but farther along in "the process" than E.M. *Id.* at 97. When mother has not been in contact with the children, R.M. considers other options, including adoption, but when mother contacts them, she gets her hopes up again. *Id.* at 97–98. Watson acknowledges R.M. loves her mother, feels loyalty towards her, and worries about her, but believes their relationship has deteriorated. R.M. recognizes mother has been out of her life for two and one-half years, and that she is in placement due to mother's failures. *Id.* at 103.

¶ 37 Watson feels R.M. needs permanency in her life and a stable parental figure, which the foster mother provides. *Id.* at 98–99. R.M. is also conflicted as to whether she will continue to communicate with mother if mother's rights are terminated. *Id.* at 99–100. She expressed sadness at the prospect of a cessation of communication with mother. *Id.* at 104.

¶ 38 Watson also feels that a decision is in R.M.'s best interests, so that she can move forward but also feels that a stable placement with caregivers who can provide her guidance is in her best interests. *Id.* at 101. Watson does not feel termination of mother's rights and the attendant cessation of contact between mother and children will harm R.M., but would benefit her by eliminating her false sense of hope. *Id.* at 101. 103–105.

¶ 39 Watson believes terminating mother's rights and finding her an adoptive placement, someone committed to her beyond age eighteen, will benefit R.M. by giving her a sense of family. *Id.* at 104–106. Watson acknowledged she was unaware whether the foster family would be committed to R.M. beyond age eighteen, and also acknowledged that by the time mother's rights were terminated, if that were the outcome, both children, would be of age that there consent is required for adoption. *Id.* at 106–107.

¶ 40 Both Rieger and Watson described a very strong bond between the siblings,

and Rieger feels it is important that the children remain together. *Id.* at 85, 96.

¶ 41 In analyzing this case, we must remain cognizant of our deferential standard of review—we must determine whether the decision is supported by competent evidence and, "absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re B.L.W., supra* at 383. Although competent evidence of record supports the court's findings that severing the bond between mother and children will not harm the children, given the unique circumstances of this case, we find the court abused its discretion in finding that termination serves the needs and welfare of the children.

¶ 42 If an adoptive placement were already identified for these children, our decision likely would be different. As this case has been pending, however, the children have continued to age. No adoptive placement has yet been identified for the children, and the reality is, it is not likely an adoptive family will be found at this late stage of their childhood. Although testimony indicates termination of parental rights will eliminate their false hope that they will reunite with mother, R.M. seems to accept this reality already. In addition, termination may very well create a new false hope—that they will be adopted at this late stage of their childhood.

¶ 43 Further, the children need to consent to adoption at this point. Testimony indicates R.M. is farther along in "the process" than E.M. This is evident particularly given the fact that R.M. did not appeal, but E.M. has. It would not benefit these children to separate them if one is willing to consent to adoption and the other is not. In his appellate brief, E.M. specifically emphasizes his consent to adoption is required. E.M.'s brief at 11. We note there have been two constants in the children's lives since they have been in placement, their foster home in which they are very comfortable, and their relationship with each other. Both therapists agree there is a very strong bond between the children, and E.M.'s therapist felt it was very important the children remain together.

¶ 44 In addition we note neither child has expressed a commitment to a cessation of contact with their mother in the event of termination, nor will anything prevent them from remaining in email contact, or even telephone contact, if they so chose. We would delude ourselves to pretend otherwise. They remained in email contact when the only court-sanctioned communication was supervised telephone contact during therapy sessions. They can also reunite with mother in the not too distant future, when they are eighteen and age out of the system.

¶ 45 In sum, we are resigned to agree with mother—nothing will change whether mother's rights are terminated or not, and the only thing that will be accomplished by termination is that the children will be true orphans. We further agree the children currently have permanency to the fullest extent possible under the circumstances.

¶ 46 In addition we note both therapists testified that *a decision, whatever that is,* would benefit the children so that they can move forward accordingly.

¶ 47 Although the statutory criterion has been met for termination, the court abused its discretion in concluding termination serves the needs and welfare of these children.

¶ 48 Order vacated.

¶ 49 Jurisdiction relinquished.