J-S29029-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: T.W.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.B., NATURAL FATHER | No. 1856 WDA 2015 |

Appeal from the Order October 14, 2015
In the Court of Common Pleas of Jefferson  County
Orphans' Court Division, at No(s): 18A-2015 O.C.

| | |
|---|---|
| IN RE: T.N.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.B., NATURAL FATHER | No. 1857 WDA 1015 |

Appeal from the Order Entered October 14, 2015
In the Court of Common Pleas of Jefferson County
Orphans' Court Division, at No(s): 17A-2015 O.C.

BEFORE:  BENDER, P.J.E., PANELLA, J.and FITZGERALD*, J.

MEMORANDUM BY PANELLA, J.                    **FILED JULY 15, 2016**

---

* Former Justice specially assigned to the Superior Court.

In these consolidated appeals, J.B. ("Father") appeals from the orders entered on October 14, 2015, in the Court of Common Pleas of Jefferson County, which involuntarily terminated his parental rights to his minor daughter, T.W.B., born in December 2014, and to his minor son, T.N.B., born in June 2013 ("Children").[1] In addition, Father's counsel has moved to withdraw and has filed an **Anders**[2] brief, averring that the instant appeal is frivolous. We affirm and we grant counsel's request to withdraw.

The trial court summarized the relevant facts and procedural history as follows. T.N.B. was born in Bucks County, Pennsylvania, nine weeks premature. At the time of T.N.B.'s birth, he suffered from a number of medical conditions and was required to be hospitalized for the first month of his life. The hospital had concerns about the parents' ability to care for T.N.B., as he would require special care and an apnea monitor upon his discharge from the hospital and the parents showed little interest.

On July 16, 2013, Buck County Children and Youth Services sought and received emergency protective custody of the child. T.N.B. was adjudicated dependent in Bucks County. Jefferson County Children & Youth Services ("CYS") accepted the case due to concerns that Mother and Father would not be able to adequately deal with the child's medical needs. T.N.B.

---

[1] M.L.K.'s ("Mother") parental rights to T.W.B. and T.N.B. were also involuntarily terminated on October 14, 2015 pursuant to section 2511(a) of the Adoption Act. Mother is not a participant in the instant appeal.

[2] **Anders v. California**, 386 U.S. 738 (1967).

was placed in the Jefferson County home of his paternal grandmother ("Paternal Grandmother"), where T.N.B. has remained to date. Shortly after T.N.B.'s move to Paternal Grandmother's home in Jefferson County, both parents also relocated to Jefferson County.

Mother later gave birth to T.W.B. in Jefferson County. Three days after T.W.B.'s birth, CYS sought emergency protective custody of T.W.B., citing concerns over the parents' ability to care for a premature newborn. The trial court granted the request and transferred legal and physical custody of T.W.B. to CYS and placed her with Paternal Grandmother, where she has remained.

After relocating to Jefferson County, the parents participated in supervised visits with T.N.B. and eventually with T.W.B. Initially, the supervised visits were permitted to occur at Paternal Grandmother's residence as often as desired by the parents. Personal conflict eventually arose between Mother, Father, and Paternal Grandmother, necessitating visits to be held at either the CYS Office in Brookville or the Public Library in Punxsutawney.

Throughout the Children's case, Father's main Family Service Plan ("FSP") requirements were to obtain stable and adequate housing for a period of at least six months, provide proof of financial stability, obtain full psychological evaluations and follow through with any recommendations, and complete an approved parenting course.

Following permanency review hearings in January, April, and October 2014, and in January 2015, Father was only minimally compliant with his permanency plan. On October 29, 2014, the trial court entered an aggravated circumstances order against Father on the basis that he had failed to maintain substantial and continuing contacts with T.N.B. for a period of six months.

Although it was no longer required to do so, CYS continued to make efforts to facilitate reunification. CYS continued to permit regular visits and kept track of the parents. Both parents had regularly scheduled supervised visits in December 2014. By the end of that month, Father was on his way to fulfilling his major goals toward reunification. Although he had yet to complete full psychological evaluations, he was able to establish residential and financial stability and was pursuing a relationship with Children. Father's last contact with Children ended on January 8, 2015, when he moved out of the area.

After leaving Jefferson County, Mother and Father eventually split up and refused to furnish CYS with valid addresses. Thus, every piece of mail sent by CYS was undeliverable, including the ones sent to the false addresses which the parents eventually provided, and CYS could not determine whether either parent had obtained stable housing or found jobs in Bucks County or in the Philadelphia area.

Father virtually abandoned his efforts to communicate with Children after leaving Jefferson County. Although Father had several telephone

conversations with the caseworker from Jefferson County, he only asked about Children one time. He only once requested photographs and sent written correspondence, namely a birthday card mailed to CYS to be shown to T.N.B. but not given to Paternal Grandmother. Father showed no concern for Children. He also did not attempt to make physical contact with Children and did not request alternative methods of visitation, including Skype visits or telephone calls.

Father testified that he moved back to Bucks County in order to distance himself from the drama with Paternal Grandmother and her boyfriend. Father alleged that their interactions were usually confrontational and had resulted in him being arrested more than once.

Evidence shows that Paternal Grandmother has been caring for T.N.B. from the time that he was just three months old, and T.W.B. from the time that she was just three days old. Paternal Grandmother's home has been approved through CYS, and Paternal Grandmother has seen to the physical, medical, and emotional need of Children since taking custody of them. Paternal Grandmother has expressed her desire to adopt Children when Father's parental rights are terminated.

CYS filed petitions for involuntary termination of parental rights of Father for both Children on July 17, 2015. The trial court held a termination hearing on September 25, 2015. At the hearing, CYS caseworker, Rebecca Wallace, testified. Father appeared by telephone and was represented by counsel. Children's guardian *ad litem*, Kerith Strano Taylor, Esquire, was also

present. Following the hearing, the trial court entered orders granting CYS's petitions for the involuntary termination of Father's parental rights.

Father timely filed notices of appeal.[3] We consolidated the appeals *sua sponte*.

When counsel files an **Anders** brief, this Court may not review the merits without first addressing counsel's request to withdraw. **See Commonwealth v. Washington**, 63 A.3d 797, 800 (Pa. Super. 2013). In **In re V.E.**, 611 A.2d 1267 (Pa. Super. 1992), this Court extended the **Anders** principles to appeals involving the termination of parental rights. **See id**. at 1275. Counsel appointed to represent an indigent parent on a first appeal from a decree involuntarily terminating parental rights may petition this Court for leave to withdraw representation and submit an **Anders** brief. **See In re S.M.B.**, 856 A.2d 1235, 1237 (Pa. Super. 2004).

The Pennsylvania Supreme Court has articulated the procedure to be followed when court-appointed counsel seeks to withdraw from representing an appellant on direct appeal:

> [I]n the Anders brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the

---

[3] We note that the appeals are timely, as the thirtieth day following the entry of the decree fell on Sunday, when the court was closed. **See** Pa.R.A.P. 903(a) (proving that a notice of appeal shall be filed within 30 days after the entry of the order from which the appeal is taken); 1 Pa.C.S.A. § 1908 (regarding computation of time.)

- 6 -

appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009). Once counsel has met his obligations, "it then becomes the responsibility of the reviewing court to make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous." *Id*. at 355 n.5 (citation omitted).

Counsel has complied with the technical requirements of **Anders** as articulated in **Santiago**. Additionally, counsel confirms that he sent a copy of the **Anders** brief to Father, as well as a letter explaining that Father has the right to proceed *pro se* or the right to retain new counsel. Counsel has appropriately appended a copy of the letter to the motion to withdraw, as required by this Court's decision in **Commonwealth v. Millisock**, 873 A.2d 748 (Pa. Super. 2005). **See also Commonwealth v. Daniels**, 999 A.2d 5990, 594 (Pa. Super. 2010). Hence, we proceed to a review of the merits.

We review the appeal from the termination of parental rights in accordance with the following standard.

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often

stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

[T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained that

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id*. (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of § 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en*

*banc*). Here, the trial court terminated Father's parental rights under, among other subsections, § 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> **(2)** The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

To satisfy the requirements of § 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See **In re Adoption of M.E.P.***, 825 A.2d

1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under subsection (a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *See In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

> With respect to 2511(b), the requisite analysis is a
>
> [f]ocus[ ] on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

The *Anders* brief note that Father contends that the court erred in terminating Father's parental rights under subsection (a)(2). In the *Anders* brief counsel explains why this is not the case. We conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights to the Children, we affirm the orders of the trial court pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b), based on the concise, thoughtful and well-written trial court opinion authored by President Judge

John Henry Foradora.  ***See*** Opinion, filed 10/14/15. We also grant counsel's petition to withdraw.

After examining the issues contained in the ***Anders*** brief and after undertaking our independent review of the record, we concur with counsel's assessment that the appeal is wholly frivolous.

Orders affirmed.  Petition to withdraw as counsel granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>7/15/2016</u>

IN THE COURT OF COMMON PLEAS OF JEFFERSON COUNTY,
PENNSYLVANIA
ORPHANS' COURT DIVISION

FILED

OCT 1 4 2015

IN RE: :
T███████ N███████████B██████ : No. 17A – 2015 O.C.
Date of Birth: June██2013 :

DIANE MAIHLE KIEHL
CLERK OF ORPHANS' COURT
REGISTER OF WILLS

IN RE: :
T██████ W████████B██████ : No. 18A – 2015 O.C.
Date of Birth: December██2014 :

OPINION OF THE COURT

### Introduction

On July 17, 2015, Jefferson County Children & Youth Services ("CYS") filed petitions to involuntarily terminate the parental rights of M██████I████ K███████ ("Mother") and J██████ B████("Father") with respect to T██████ N████████ B███("Tacoda") and T████ W████ B███ ("Takara"). With respect to T██████, it alleged that termination was appropriate pursuant to 23 Pa. C.S.A. § 2511(a)(1), (a)(2), (a)(5), and (a)(8). Subsections (a)(2) and (a)(6), it alleged, warranted termination with regard to T██████. It further asserted that termination was in both children's best interests.

At a hearing held September 25, 2015, CYS caseworker Rebecca Wallace ("Wallace") testified in support of the petitions. Appearing by telephone and represented by counsel, Mother and Father testified in opposition. Also present was the children's guardian *ad litem*, Kerith Strano Taylor, Esquire.

### Factual Findings

T██████ was not yet three months old when CYS accepted his case as a transfer from Bucks County, where he had been adjudicated dependent due to concerns that Mother and Father could not adequately attend to his medical needs. He was already in kingship placement with his paternal grandmother ("Grandma") at the time of transfer.

On October 11, 2013, Mother, Father, and Grandma signed a family services plan with the idea that T██████ would eventually be reunited with his parents. Before that could happen, though, and as the caseworker explained to them, Mother and Father were required to obtain stable and adequate housing for a period of at least six months, provide proof of financial

stability, obtain full psychological evaluations and follow through with any treatment recommendations, and complete an approved parenting course. On the date CYS filed its petitions, however, they were still three requirements short of reunification.

Initially, Mother and Father were permitted unlimited supervised visits at Grandma's house. After threatening Grandma and her support system, they were no longer welcome at her home. Further visitation occurred either at the library in Punxsutawney or CYS's visiting room in Brookville.

Following permanency review hearings in January, April, and October 2015 and January 2015, the Court found that Mother and Father were only minimally compliant with their permanency plan.[1] In July they were deemed to be moderately compliant. Whatever else they may have been doing, however, Mother and Father were not actively engaging with their young son. On October 29, 2014, therefore, the Court entered an aggravated circumstances order against both parents on the basis that they had failed to maintain substantial and continuing contact with T██████ for a period of six months. Exh. 1.

Although it was no longer required to do so, CYS continued making efforts to facilitate reunification. In that regard, they continued to permit regular supervised visits at the agency and kept track of Mother's and Father's overall compliance with the permanency plan. Ms. Wallace was thus able to confirm that both had regularly attended their scheduled visits in the month of December 2014.[2] Rather than serving as a turning point for them, however, December engendered further CYS involvement, because three days after Mother gave birth to the 4-pound T██████, the hospital released her to the agency, which placed her with her brother at Grandma's residence. As was the case with T██████, medical authorities were concerned about the parents' capacity to address their newborn daughter's medical needs. Mother had not been compliant with her prescribed pre-natal regimen, and when she was at the hospital to give birth, she and Father refused to provide an address or allow the hospital to establish in-home nursing visits to help ensure the child's well-being.

By the end of December, Mother and Father were well on their way to fulfilling their major goals toward reunification. Though they had yet to complete full psychological evaluations, they

---

[1] The dependency records, of which the Court took judicial notice, are available at CP-33-DP-02-2014 and CP-33-DP-95-2014.

[2] That may have occurred in November, as well, although the Court knows from the aggravated circumstances order that they had not done so in the six months preceding.

2

were compliant in terms of establishing residential and financial stability and were actively pursuing relationships with their children. That all ended on January 8, 2015, however, which was the last time Mother and Father had any contact with T█████ and T█████ before moving back to Bucks County.

Since leaving Jefferson County, Mother and Father have refused to furnish CYS with valid addresses. At one point they told the caseworker they would only cooperate if the agency transferred their cases to Bucks County, and the addresses they did finally provide were false. Thus, every piece of mail the agency sent was returned as undeliverable. As a result, CYS could not determine whether either parent had obtained stable housing in Bucks County. Similarly, their refusal to provide proof of income made it impossible to ascertain their financial wherewithal.

More significantly, Mother and Father virtually abandoned their efforts to communicate with T█████ and T█████ after leaving the county. Among several telephone conversations with the caseworker, they asked only once about the children, which was the same number of times they requested photographs and sent written correspondence—a birthday card mailed to the agency with instructions that it be shown to T█████ but not given it to Grandma. Aside from that, Mother and Father showed no concern for their children. They did not attempt to make physical contact; did not request alternative methods of visitation, such as Skype visits or telephone calls; and were not even interested enough to stay abreast of their developments and activities. It appeared, in fact, that Mother and Father all but forgot they had two children still residing in Jefferson County.

Asked why he moved to Bucks County in the first place, Father testified that it was to distance himself from the drama with Grandma and her boyfriend. Their interactions, he said, were usually confrontational and had resulted in him being arrested more than once. Mother similarly said that Grandma's false accusations had prompted her to leave, as well as her desire to better herself and prove to herself and her children that she could do it without help.

While their parents have been pursuing their own interests, Grandma has been caring for T█████ and T█████, T█████ from the time he was no older than three months of age and T█████ from a mere three days old. Her home has been approved through CYS, and she has appropriately seen to their physical, medical, and emotional needs since taking custody of them.

3

The agency has no reason to believe that she will not continue to do so, especially in light of her express desire to adopt them if their parents' rights are terminated.

## Discussion

Under 23 Pa.C.S.A. § 2511(a)(1), termination is warranted where"[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." *Id.* Under that construct, no credit will be given to a parent who, after receiving notice of a petition, attempts to remedy the conditions that warranted it. *In re. E.M.*, 908 A.2d 297, 303 (Pa. Super. 2006). To the extent that it helps establish a more complete history, however, his or her post-petition conduct, as well as his or her actions prior to the start of the six-month timeframe, may be relevant. *Id.* If that history, i.e., the totality of the circumstances, clearly and convincingly supports a petitioner's request for termination, the Court may terminate a person's parental rights. *In re M.G. & J.G.*, 855 A.2d 68, 74 (Pa. Super. 2005).

In this case, CYS filed its petitions on July 17, 2015, the statutory timeframe thus having commenced on January 17, 2015.

Subsection (a)(2) articulates separate and distinct requirements, specifying that a parent's repeated and continued incapacity, abuse, neglect, or refusal to parent is cause for termination where it has left the child without essential parental care, control, or subsistence and is not likely to be remedied by the parent. § 2511(a)(2). The facts supporting termination under (a)(1) frequently support the same result under (a)(2).

Whereas (a)(1) and (a)(2) apply with respect to all children, subsections (a)(5) and (a)(8) are specific to parents whose children have been removed from their care. The latter provides that a parent's rights may be terminated when "[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child." Subsection (a)(5) is substantially similar. The placement period need only be six months, however, and it must be obvious that the parent, even utilizing the services and resources reasonably available to him or her, cannot remedy the conditions that led to the placement within a reasonable period of time. *Id.*

4

Finally, subsection (a)(6) addresses a parent's conduct toward a newborn child, providing that termination is warranted where the parent, knowing or having reason to know of the child's birth, does not reside with her, has not married her other parent, and, for the four months preceding the filing of a petition to terminate, has failed to make reasonable efforts to maintain substantial and continuing contact and to provide financial support. § 2511(a)(6).

In these cases, CYS has proven clearly and convincingly that the parents' conduct merits termination under each subsection as alleged in the above-captioned cases.

While recognizing that parents' individualized circumstances may affect the degree to which they are able to meet their children's needs, the law articulates certain minimal standards for parenting. Parental obligation, it says, is a positive duty requiring affirmative performance. *In re Z.P.* 994 A.2d 1108, 1118 (Pa. Super. 2010). Accordingly, it demands that a parent show continuing interest in his or her child and make a genuine effort to maintain communication, because a merely passive interest in the child's development cannot satisfy his or her need for love, protection, guidance, and support. *Id.*

Fulfilling one's parental obligation does not necessitate the impossible, of course, but may entail that which is difficult and demanding. *In re Adoption of T.M.*, 566 A.2d 1256, 1258 (Pa. Super. 1989). Even in difficult circumstances, therefore, a mother or father must act affirmatively, with a good faith effort and interest, to maintain a parent-child relationship to the best of his or her ability. *Id.* As *In re Burns*, 379 A.2d 535 (Pa. 1977), plainly states "parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'" *Id.* at 540 (quoting *Appeal of Diane B.*, 321 A.2d 618, 620 (Pa. 1966)).

Further refining those principles, our courts have also held that parents cannot simply defer to their problems and expect to successfully use them as an excuse for their failure to be parents. *In re Adoption of T.M.*, 566 A.2d at 1258. Rather, parents faced with obstacles "must act affirmatively to maintain a relationship with their children, *even in difficult circumstances*." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004)(emphasis added).

In this case, Mother and Father have not even come close to meeting their minimum obligations as T█████'s and T█████'s parents. They have persistently refused to do what was necessary to reunite with their children and have relied on their own selfish goals and wholly surmountable problems to justify their neglect. That has been the case for nearly all of T█████'s life and the entirety of T█████'s.

T███ is now more than two years old and has been living with Grandma at least since Jefferson County started providing services in September of 2013. He has been in placement, then, for well over twelve months. T███ is eleven months old and has lived with Grandma her entire life. For the last ten months, though, which includes the six-month period specified in 23 Pa. C.S.A. § 2511(a)(1), Mother and Father have had no personal contact with either child. They sent a single card for T███'s birthday, requested photographs on one occasion, and asked about the children during one conversation with their caseworker. T███ and T███ have not seen their parents' faces or heard their voices since January 8, 2015, however. Nor have they received gifts, financial support, or written correspondence through which they could maintain a connection with them. T███ was barely more than a month old when they left, though, and T███, though nineteen months old at the time, had not yet become well acquainted with them due to their failure to maintain substantial contact for at least the six months from late February through late October 2014. When Mother and Father left Jefferson County, therefore, neither of their children really knew them. It was thus essential that they reach out to establish and maintain parent-child relationships with both T███ and T███ They deemed their own needs and preferences to be more important.

In consequence of their failure, Mother and Father have left T███ and T███ without the physical, mental, and psychological resources all children need and that society expects their parents to provide. Their failure in that regard has not been the result of insurmountable hardship.

While living in Jefferson County, Mother and Father were afforded ample opportunity to regain custody of their children and knew exactly what they needed to do to make that happen. They were simply unwilling to comply with the requirements they thought were unnecessary, such as the acquisition of full psychological evaluations. They were also unwilling to make the personal sacrifices necessary to maximize the time they could spend with their children. Had they exercised greater self-control, for instance, they would have retained the ability to enjoy unlimited visits at Grandma's house. Had they made parenting a higher priority, moreover, there never would have been an aggravated circumstances order declaring their failure to maintain substantial and continuing contact with T███.

Mother and Father continued to create their own obstacles by moving to Bucks County, where they would have to re-establish stable housing and financial security and from which it

would be substantially more difficult to maintain continuing contact with T████ and T█████ They added to their difficulties by then refusing to provide valid addresses and proof of employment from which CYS could determine their level of compliance with their family services plan. They also persisted in refusing to obtain full psychological evaluations.

The aggravated circumstances order notwithstanding, and even after identifying the children's placement goals as adoption, CYS continued to offer its support and services to Mother and Father. It continued to facilitate visitation with both children while they remained in Jefferson County and, even after they moved, would have allowed further visits had they ever called to make suitable arrangements. It also made numerous attempts to ascertain whether Mother and Father were working toward satisfying the original permanency plan, which the Court can reasonably assume was because of its willingness to permit them to finalize it. Whether in Jefferson County or Bucks County, though, both parents declined to take advantage of the proffered opportunities and services.

Given their conduct since moving to Bucks County, it is highly unlikely that either parent will remedy the causes of their neglect and incapacity.

Reinforcing that conclusion is the fact that Mother and Father continue to perceive themselves as victims and blame everyone else for their situation. Conveying that mindset, Father testified that his family was "perfect" until CYS tore them apart, and he blamed the hospital for T████'s placement, indicating that the staff had lied about the precipitating circumstances. Additionally, he *and* Mother blamed Grandma and her boyfriend for creating the hostile situation that "made" them leave the county where their children resided. They also laid responsibility at others' feet when asked why their mail was being returned as undeliverable to the addresses they had previously given CYS and also provided to the Court at the termination hearing: Father blamed the fictional Jose, whose name he was hard-pressed to recall and whose motive he could not identify, while Mother blamed her mother's landlords, who did not want Mother there because "I guess the office don't like me." They further suggested that CYS was at fault for not doing more to help them stay in touch with T████ and T█████ after their move, never acknowledging that it was their decision to relocate that culminated in the current situation.

That victim mentality says a lot about whether Mother and Father will remedy their failures, because it is a well-known fact that a person must acknowledge and take responsibility

7

for his or her own actions before he or she can begin to rectify the circumstances those actions have occasioned, and in failing to do that, Mother and Father, by their own testimony, have solidified the Court's conclusion that they will not remedy within a reasonable period of time the circumstances that led to their children's removal.

The Court further concludes that termination will best serve the children's needs and welfare. Grandma has been their caretaker for all of T██████'s life and most of T██████'s. She has been the one meeting their physical, emotional, and psychological needs to CYS's complete satisfaction. She has also been the one offering them the love and support children need and crave and has done it because she loves her grandchildren. Accordingly, she intends to adopt them and make their family situation permanent if Mother's and Father's parental rights are terminated. That being the case, T██████ and T██████ will stay together in the only home they have known and in the environment where they have thrived. Given their parents' complete absence since January 8, 2015 and inconsistent contact before that, moreover, there is no reason for the Court to assume that it would be destroying a beneficial parent-child bond.

Because CYS has proven clearly and convincingly that termination is appropriate under each of the subsections alleged in the subject petitions and is in the children's best interests, therefore, the Court will enter a decree terminating the parental rights of Mother and Father with respect to both children.

8