J-S42029-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.A.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.M., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 339 MDA 2018 |

Appeal from the Order Entered January 17, 2018
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
4223

BEFORE:   BOWES, J., McLAUGHLIN, J., and STRASSBURGER*, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED AUGUST 24, 2018**

L.M. ("Mother") appeals from the order terminating her parental rights to S.A.M. ("Child"). We conclude the trial court did not abuse its discretion and, therefore, affirm.

The trial court set forth the factual and procedural history, which we adopt and incorporate herein. Trial Court Opinion, filed Jan. 17, 2018, at 1-8.

The trial court concluded that Children and Youth Services ("CYS") established, by clear and convincing evidence, that grounds for termination of Mother's rights existed under 23 Pa.C.S.A. §§ 2511(a)(2), (5), and (8). The trial court further found that termination was proper under § 2511(b). Mother filed a timely Notice of Appeal.

Mother raises the following issue on appeal:

> 1. Whether the lower court erred in terminating Mother's parental rights when she would not separate from her husband who was the natural father of the minor child?

_____

* Retired Senior Judge assigned to the Superior Court.

Mother's Br. at 5. Mother contends the trial court erred because it relied on environmental factors beyond Mother's control and on Mother's unwillingness to separate from Father.

When reviewing orders terminating parental rights, we must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). Where "the factual findings are supported," we review the decision "to determine if the trial court made an error of law or abused its discretion." *Id.* We will reverse a decision "for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.*

The Pennsylvania Supreme Court has explained the reason for applying an abuse of discretion standard to termination decisions:

> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Id.* at 826-27 (citations omitted).

A trial court may terminate parental rights only after finding grounds for termination existed under Section 2511(a) and that termination is in the

child's best interest under Section 2511(b). Although the trial court terminated Mother's parental rights pursuant to several subsections of 2511(a), we need only conclude that its decision was proper under any one subsection of Section 2511(a). **In re B.L.W.**, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we conclude that the trial court properly terminated Mother's parental rights pursuant to Sections 2511(a)(2).

We will first review the trial court's conclusion that termination was proper under Section 2511(a)(2), which provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To terminate parental rights pursuant to Section 2511(a)(2), the moving party must produce clear and convincing evidence of the following: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **In re Adoption of M.E.P.**, 825 A.2d

1266, 1272 (Pa.Super. 2003). Further, Section 2511(b) provides: "The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent."

The trial court found that Children and Youth Services ("CYS") proved, by clear and convincing evidence, that grounds to terminate Mother's parental rights under Section 2511(a)(2) existed. Contrary to Mother's contention on appeal, the trial court did not rely on her refusal to not live with Father or solely on environmental factors that were beyond her control. Rather, the court stated that Mother could not recognize the safety threat that Father posed and noted, among other concerns, that Mother had physical and mental limitations and was unable to provide for Child's basic needs without assistance. TCO at 13. Mother was unable to feed or diaper Child, and could not recognize Child's cues. *Id.* The court reasoned that CYS "provided ample assistance and education to Mother . . . , both in the past with respect to R.M.[, an older sibling,] and more recently during supervised visits with [Child], but Mother has not shown progress in developing competencies to meet these most basic needs of a child." *Id.* (internal citations omitted).

We conclude the record supports the trial court's factual findings and that the trial court did not abuse its discretion in terminating Mother's parental rights to S.A.M. After review of the briefs, the record, and the well-reasoned

opinion of the Honorable Katherine V. Oliver, we agree with the trial court and affirm on the basis of the trial court opinion. TCO at 13-14.[1]

To the extent mother also challenges the trial court's findings under Section 2511(b), we find that the trial court did not abuse its discretion in finding termination proper under Section 2511(b).

Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.

23 Pa.C.S.A. § 2511(b). The focus under Section 2511(b) is not on the parent, but on the child. ***In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa.Super. 2008) (*en banc*). Pursuant to Section 2511(b), the trial court must determine "whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child." ***In re C.M.S.***, 884 A.2d 1284, 1286 (Pa.Super. 2005). This Court has explained that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." ***Id.*** at 1287. The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." ***Id***.

Here, the trial court found termination would be in Child's best interest. It reasoned that Child is thriving in her foster placement, is physically and

---

[1] In the event of future proceedings, the parties shall attach a redacted copy (using initials) of the trial court opinion.

developmentally on track, and the foster parents are meeting her physical, emotional, and medical needs. TCO at 15. The trial court further noted that Child lives with her biological sister, R.M., and has two foster siblings. *Id.* The trial court noted that Mother loved child, but found that "there was no evidence of a reciprocal bond between Mother and [Child]." *Id.* The record supports these factual findings and the trial court did not abuse its discretion in finding termination would best meet Child's developmental, physical and emotional needs and welfare.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 08/24/2018

IN THE COURT OF COMMON PLEAS, CENTRE COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE: S███████ A███ M█████, a minor        :      NO: 4223
      DOB: March █, 2016            :

Oliver, J.

*Counsel for Natural Mother, L███ M████:*     Karen G. Muir, Esq.
*Counsel for Natural Father, R███ M████, Jr.:*     Steven Trialonas, Esq.
*Counsel for S████ A███ M████, a minor:*     Charles Kroboth, Esq.
*Guardian ad Litem:*     Parviz Ansari, Esq.
*Counsel for Children and Youth Services:*     Bobbie Rabuck, Esq.

**Opinion and Order**

### I.    *Procedural Background*

Presently pending before the Court is a Petition to Terminate Parental Rights ("TPR Petition") as to natural father, R███ M████, Jr. ("Father") and natural mother, L███ M████, ("Mother"), (collectively "Parents"), to their minor daughter, S████ A███ M████ (the "Minor Child" or "S.A.M."). S.A.M. is approximately twenty-two months old, having been born on March 4, 2016. S.A.M. was removed from Parents' care shortly after her birth and has been in foster care since that time. The TPR Petition was filed by Centre County Children and Youth Services, ("CYS" or the "Agency"), on March 4, 2017.

By Order dated March 21, 2017, a hearing on the TPR Petition was scheduled for May 24, 2017. On March 23, 2017, Steven Trialonas, Esq., was appointed to represent Father, and Karen Muir, Esq., was appointed to represent Mother. Charles Kroboth, Esq. was appointed as legal counsel for the child by Order entered on April 10, 2017. [1]

---

[1] At the time the Agency filed the TPR Petition, S.A.M. was represented by a guardian *ad litem*, Parvis Ansari, Esq., in the underlying dependency case. Although Mr. Ansari was intimately familiar with the case and is a licensed

☐ O ☐ RD ▌ S


01/22/18

At the time of the hearing scheduled for May 24, 2017, all Parties appeared, but the hearing could not proceed due to an apparent medical emergency experienced by Father. (*See* Order dated May 24, 2017, Oliver, J.). The hearing was ultimately rescheduled. The TPR Petition was heard on September 5, 2017. Following the conclusion of testimony on that date, the Court ordered the submission of findings of fact and conclusions of law. The matter is now ripe for decision. For the reasons discussed below, the Court grants the Agency's Petition and terminates Mother and Father's parental rights as to S.A.M.

## II. Factual Findings

CYS first became involved in this matter on learning of Mother's pregnancy with S.A.M. in September of 2015. At that time, there was an ongoing dependency proceeding with respect to another child of Parents that began in 2010 when Mother was pregnant with the couple's first child, R.M. (Hr'g. Tr., at 5-13).[2]

A summary of the Agency's involvement in the R.M. case is necessary to a full understanding of the present matter. Before R.M.'s birth, CYS sought to engage Mother and Father in preventative services due to concerns stemming from Father's status as a convicted sex offender and a sexually violent predator ("SVP"). (Hr'g. Tr., at 5). Father's SVP status was determined by Judge Thomas Kistler on October 17, 2005 in connection with convictions for sexual assault, aggravated indecent assault, two counts of indecent assault, and two counts of corruption of minors. (*Id.* at 5-6, 11). Testimony at the September 5, 2017 hearing recounted that, although Mother and Father participated in in-home Parenting Plus services for a brief

---

attorney in the Commonwealth, the Pennsylvania Supreme Court's decision in *In re: Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017)(plurality op.), presented uncertainty regarding whether the appointment of a separate individual to serve as legal counsel for S.A.M. was required. In an abundance of caution, the Court appointed Charles Kroboth, Esq., as legal counsel for S.A.M. By Order entered on May 23, 2017, Mr. Ansari was appointed as guardian *ad litem* for S.A.M. in the TPR proceeding.

[2] All transcript references are to the transcript of the TPR hearing conducted on September 5, 2017.

2

period during Mother's pregnancy, they subsequently discontinued the services and refused further preventive services offered by the Agency. (*Id.* at 6). R.M. was born in July of 2010 and taken into emergency custody by CYS. A dependency petition and adjudication followed, and R.M. was adjudicated a dependent child and placed in the care and custody of the agency. (*Id.* at 5-6). Agency concerns revolved around potential risks posed by Father's SVP status and related issues, Mother's physical and cognitive limitations, Mother's failure to appreciate or acknowledge the potential risks posed to the child due to Father's SVP status, and an inability of Mother to care for and protect the child, even with assistance and support from Mother's family due to their inability to stand up to Father. (*Id.* at 5-8).

Mother and Father were provided reunification services with respect to R.M. through Family Intervention Crisis Services ("FICS").[3] Those services included development of service agreement goals, parent education sessions, individual and family sessions, with both parents and with each parent separately, and supervised visits with R.M. (*Id.* at 6, 28). During that process, several impediments to Mother's ability to parent were identified, such as Mother's inability to prepare bottles without direction from another adult, inability to change diapers without assistance, difficultly in holding and physically handling the infant, and difficulty in understanding hunger cues and other cues of an infant's basic physical needs. (*Id.* at 7-8, 28-29). CYS learned that Mother had an individualized education plan in school and has some cognitive limitations. (*Id.* at 7). Mother seemed unable to read and comprehend things like preparation instructions on a baby formula container, and she was unable to retain information even when it was explained and broken down for her. (*Id.* at 7-8, 30, 50, 52-3).

---

[3] Father was subject to an aggravated circumstances order, and, thus, reunification services were not ordered; however, because Father was living in the home with Mother, the agency incorporated Father into the services. (*Id.* at 27).

3

As to Father, there were significant concerns regarding Father's mental health and stability. A major issue was Father's SVP status and his failure to continue with legally mandated counseling and treatment associated with that designation. (*Id.* at 10-12, 32-33, 41). Father also failed to manage his treatment needs for a seizure disorder. (*Id.*). In addition, he was argumentative with service providers, and refused to take prescription medications for treatment of his anger and mood disorder. (*Id.* at 17-18).

Reunification services with respect to R.M. continued for approximately nine to twelve months as the Agency and its service providers attempted to work with Mother and Father to try to surmount the identified safety issues. (*Id.* at 7-12). Mother and Father failed to make significant progress, however, and reunification services were ultimately deemed unsuccessful and a petition for involuntary termination of parental rights as to R.M. was filed. (*Id.* at 12). Mother and Father subsequently agreed to voluntarily relinquish their parental rights to R.M., and R.M. was adopted by her foster placement family. (*Id.* at 12, 13).

In September of 2015, CYS learned that Mother was pregnant with a second child, (S.A.M.), and the Agency became involved with Mother and Father again at that time to address the previously unresolved parenting issues. There were no immediately available services as of that time. (*Id.* at 13). Ongoing assessment by the Agency demonstrated that very little had changed since the Agency's past involvement with Mother and Father. Parenting deficits were still present, and Mother continued in her failure to recognize the potential danger presented by Father. In addition, Mother is meek and passive, and the Agency observed that she is often controlled by people in her life, particularly Father. (*Id.* at 8-9, 13-22, 45-46). There were no other adults who could provide the care and supervision necessary to ensure the child's safety and well-being due to Parents' limitations and the safety risk posed by Father. (*Id.* at 13).

4

Although Parents lived with Mother's parents (Maternal Grandparents) at that time, CYS' observation during prior experience with the family was that Maternal Grandparents, like Mother, would not stand up to Father. (*Id.* at 8).

Mother gave birth to S.A.M. on March 4, 2016. On that same date, CYS filed an emergency petition, and emergency custody was transferred to the Agency. (*Id.* at 13). S.A.M. was discharged from the hospital on March 6, 2016 to a kinship foster home placement, in the same home as her biological sister, R.M. (*Id.*).[4] A dependency petition was filed, and an adjudicatory hearing was held on March 16, 2016. Evidence demonstrated that Mother and Father's circumstances had not materially changed since the Agency's involvement with the first child. (*Id.*). S.A.M. was adjudicated dependent following the March 16, 2016 hearing, and her placement goal was identified as adoption. An aggravated circumstances Order was entered on that same date against Father based on clear and convincing evidence of Father's criminal history of convictions for sexual offenses against minors, his status as a sexually violent predator, and his related registration and reporting requirements. The aggravated circumstances Order provided that reunification services would not be provided as to Father. (*Id.* at 13-14).

Following the dependency adjudication, regular visitation was offered to both Mother and Father, and it was observed that both struggled with basic child care tasks such as changing diapers, and Mother continued to struggle with recognizing cues and preparing bottles and changing clothes. (*Id.* at 14-16). Mother's ability to physically hold an infant improved somewhat, but the overall significant deficiencies in her parenting skills remained the same, and Mother could not demonstrate the ability to meet S.A.M.'s most basic physical needs. (*Id.*). Furthermore, as S.A.M. grew older and more mobile, it was difficult for Mother to keep up with

---

[4] Subsequently, a third child was born to Mother and Father, H.M., who also was placed in the same foster home after a dependency adjudication. (*Id.* at 14).

5

her and to recognize normal day-to-day safety threats faced by toddlers, or to develop and implement a plan for day-to-day safety. (*Id.* at 21-22). CYS also observed Mother's ongoing cognitive limitations in terms of an inability to comprehend basic written instructions, or to retain such instructions when the steps were broken down and demonstrated for her. (*Id.* at 50). She requires constant guidance regarding how to care for and protect a child, and is not able to think and act independently in this regard. (*Id.* at 53-54).

Father's circumstances continue to pose significant safety risks for the Minor Child . (*Id.* at 5-6, 11, 41). During the time S.A.M. has been in placement, Father has refused to cooperate with CYS and to provide requested information regarding his SVP offender treatment or his mental and/or physical health. (*Id.* at 39-40). The only information available to the Agency indicated that Father had not been consistently enrolled in counseling, (*id.* at 17-18), and that he is still designated as at high risk for re-offending. (*Id.* at 32-36). Father also suffers from a seizure disorder, fainting, and medical ailments that are not well controlled and that impact his ability to safely hold and care for an infant or young child. (*Id.* at 10, 18, 32). Father struggles with mood regulation, and CYS observed him to have mood swings and to be volatile and threatening toward workers on occasion. (*Id.* at 18). At the time of the TPR hearing, Father was in jail awaiting trial on charges that he failed to comply with the registration requirements attendant to his SVP status. (*Id.* at 11-13, 40).

The ongoing nature of the concerns regarding Father's SVP status and failure to consistently participate in treatment, as well as his overall mental and physical health, make unsupervised time between Father and S.A.M. an unrealistic possibility due to serious safety concerns for the child. (*Id.* at 39-40). In addition, during supervised visits offered through the

6

Agency, Father has not been able to demonstrate an ability to meet S.A.M.'s needs. (*Id.* at 40-41).

In addition to the above, Mother and Father do not have stable housing. At the time the TPR Petition was filed, they were still living with Mother's parents. (*Id.* at 8-9). Since that time, however, they left that residence and were homeless for a time, staying in a homeless shelter in another county. (*Id.* at 19). As noted above, Father was cited and arrested on allegations of failing to comply with his SVP registration requirements by failing to register the new address at the homeless shelter. He has been incarcerated in Huntingdon County on those charges since early June of 2017. (*Id.* at 11-12, 40). Mother testified that she once again lives in her parents' home, but the Agency was not able to verify that at the time of the hearing. (*Id.* at 21).

Mother testified that she loves her children and she would do anything to protect them. (*Id.* at 63). Nonetheless, Mother remains steadfast in her refusal or inability to acknowledge the potential threat Father poses to S.A.M. Thus, Mother does not appreciate the need for supervision of any time between Father and S.A.M.. (*Id.* at 16, 35, 43-46). Mother is married to Father and loves him. (*Id.* at 43-44, 62-63). In introducing herself at the hearing, she testified: "I am L███ M████R███'s wife." (*Id.* at 59). Throughout the dependency case involving S.A.M., she maintained that she and her husband, R███, are a team. She has demonstrated an unwillingness to separate from him despite having been informed that his presence in the home poses a safety risk for their children, and that this is one of the reasons they have been placed in foster care. (*Id.* at 35, 42-46). At the hearing, Mother testified that she would do anything to protect her children, and that she would call the police on Father if he did anything wrong. (*Id.* at 62-63). When asked, however, Mother said she did not know the phone number to contact the police. (*Id.* at 64-65).

7

S.A.M. is thriving in her foster home and interacts with her foster parents as if she were their child. She is physically and developmentally on track. (*Id.* at 56). She interacts in play with her older biological sibling in the home, as well as with two foster siblings. At the age of 18 months old, S.A.M. was saying a few words. (*Id.*). She referred to her foster parents as mom and dad. (*Id.*). S.A.M.'s foster parents have facilitated supervised visits with Mother and Father. During the visits, when S.A.M. was distressed or needed comfort, she went to her foster mother for support instead of Mother. (*Id.* at 23). S.A.M.'s foster parents have provided for her physical and emotional needs since her discharge from the hospital just after her birth. (*Id.* at 24). Ms. Rockey testified that termination of Parents' parental rights would give S.A.M. the opportunity to be adopted by her foster family, who has cared for her since birth. (*Id.* at 23). This would provide permanency and would allow her to be raised in the home of a full biological sibling. (*Id.* at 23-24).

## III.    Applicable Legal Principles

Section 2511 of the Adoption Act, 23 Pa. C.S.A. § 2501, *et seq.*, sets forth the governing provisions with respect to termination of parental rights proceedings. Section 2511 requires the court to engage in a bifurcated decision-making process. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010); *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). First, the Court must determine whether any of the grounds for involuntary termination under section 2511(a) have been established. The party petitioning for termination must prove that the subject parent's conduct meets at least one of the statutory grounds for termination as set forth in section 2511(a). If the court concludes that the petitioning party's burden under section 2511(a) has been met, the court must turn to the second part of the analysis in accordance with section 2511(b). *Id.*; *In re Adoption of K.J.*, 936 A.2d 1128, 1134 (Pa. Super. 2007), *appeal denied*, 951 A.2d 1165 (Pa. 2008).

8

Under section 2511(b), the court must make a determination of the needs and welfare of the child using the best interests of the child standard. *Id.* In the best interest assessment, courts must consider whether a natural parental bond exists between the parent and child, and whether termination of parental rights would destroy an existing, necessary and beneficial relationship. *In re K.J.,* 936 A.2d at 1134. The needs and welfare of the child are paramount. *See id.* In that regard, the court must consider both intangible and tangible factors, as well as continuity of relationships. *Id.*

The petitioning party bears the burden of proof in termination of parental rights proceedings, and that burden must be met by clear and convincing evidence. *In re Adoption of K.J.,* 936 A.2d at 1131. The clear and convincing evidence standard requires evidence "so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.*

CYS asserts section 2511(a)(2), (a)(5) and (a)(8) as grounds for termination as to both Parents, and (a)(11) as to Father only. Section 2511 provides, in pertinent part, as follows:

**Grounds for involuntary termination**

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent

9

cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

(11) The parent is required to register as a sexual offender under 42 Pa.C.S. Ch. 97 Subch. H (relating to registration of sexual offenders) or to register with a sexual offender registry in another jurisdiction or foreign country.

23 Pa. C.S.A. § 2511(a)(2),(a)(5), (a)(8), (a)(11). When a termination petition is filed on more than one ground, the court need only find clear and convincing evidence as to one of the grounds alleged. *In re: E.M.*, 908 A.2d 297, 306 (Pa. Super. 2006).

When a child has been removed from the home and placed in foster care, there is an affirmative duty on the parent or parents to work toward the child's return to the home. *In re V.E. and J.E.*, 611 A.2d 1267, 1271 (Pa. Super. 1992)(citing *In re Adoption of J.J.*, 515 A.2d 883, 889 (Pa. 1986)). At a minimum, that duty requires the parents to demonstrate a willingness to cooperate with the child welfare agency with respect to rehabilitative services required to develop skills necessary to meet the demands of parenthood. *Id.* In cases involving a failure to remedy conditions that lead to removal of a child, a termination petition may be granted based on a parent's failure to cooperate or apparent inability to benefit from services reasonably offered or supplied over a realistic period of time. *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003).

10

*IV.* *Analysis*

Applying the legal principles discussed above, the Court concludes that the Agency in this case presented clear and convincing evidence that the elements of 23 Pa.C.S. § 2511(a)(2), (5), (8) and (11) are met, and that termination of both Father and Mother's parental rights best serves S.A.M.'s needs and welfare and her overall best interests.

There is no dispute, nor could there be any legitimate dispute, that the Agency met its burden under section 2511(a)(11) as to Father by clear and convincing evidence. Father was convicted of sexual assault, aggravated indecent assault, two counts of indecent assault, and two counts of corruption of minors -- all involving offenses against a minor. Father will have lifelong registration and reporting requirements as a sexual offender based on these crimes. (Hr'g. Tr., at 11). The history of these convictions is not in dispute, and there is no question that the evidence is sufficient to satisfy section 2511(a)(11) as to Father. Father nonetheless contends that termination under section 2511(a)(11) is improper, arguing that this section may not be applied in the present case because it was only passed into law after S.A.M.'s conception and birth. (*See* Father's Memo. of Law, 11-20-17, ¶¶17-21). Father argues that applying section 2511(a)(11) in this case would violate his constitutional rights "due to a lack of fair notice and governmental restraint" because he could not have been aware that simply being a registered sex offender would constitute grounds to terminate his parental rights. (*Id.* at 19-20).

The Court notes that, in enacting section 2511(a)(11), the legislature expressly stated that its provisions were to be effective immediately. (*See* 2016 Pa. Legis. Serv. Act 2016-115 (SB 1311)(Purdons)). In addressing Father's constitutional challenge, the Court must apply a "'strong presumption in favor of the constitutionality of statutes – a presumption which reflects . . . the respect due to the legislature as a co-equal branch of government.'" *See Commonwealth v.*

11

*Nicely*, 638 A.2d 213, 216 (Pa. 1994). To overcome the presumption, Father must demonstrate that the immediate effective date as provided in the legislation enacting section 2511(a)(11) "'clearly, palpably, and plainly' violates the constitution." *Id.* Father has failed to make any such demonstration, or to develop his constitutional argument. Moreover, the Court is not persuaded by Father's bare allegation that he would have made a different choice regarding conception of S.A.M. had he been aware his SVP status could be reason to terminate his parental rights. For these reasons, the Court rejects Father's argument that section 2511(a)(11) may not be applied in this case, and concludes that Father's parental rights are properly terminated under section 2511(a)(11).

Clear and convincing evidence was also presented to meet the requirements of sections 2511(a)(2), (a)(5) and (a)(8) as to both Mother and Father. With respect to section 2511(a)(2), the evidence demonstrated that both Mother and Father have continued in their inability and/or refusal to take steps necessary for them to provide essential parental care, control and subsistence necessary for S.A.M.'s well-being and safety, and that they will not remedy the underlying causes and conditions. Specifically, the evidence demonstrated that Father is a convicted sex offender for sex crimes against minor children, that he is classified as a sexually violent predator, and that he has failed to comply with counseling and treatment requirements that are mandated by law, and which could, possibly, ameliorate the safety risk he poses to S.A.M.. (Hr'g. Tr., at 17-18, 32-40). As discussed in the factual section, above, Father has refused to cooperate with the Agency in terms of providing information relative to his psychological and medical treatment, despite the many concerns about his mental and physical conditions and how those conditions impact his ability to parent. (*See* § II, *supra*.). Father has also not shown progress with respect to the limitations on his ability to meet the basic needs of an infant or young child

12

despite the services provided to him during supervised visitation. Moreover, Father is presently in jail awaiting trial on criminal charges connected with his alleged change of residence address to a homeless shelter without registering as required by law. (*Id.* at 11-13, 40).

Father complains that the Agency seeks to terminate his parental rights based on issues and concerns relating to R.M. only, and not on any "new" evidence. (*See* Father's Memo. of Law, 11-20-17, ¶ 14). The Court rejects this argument, as the record is replete with testimony that most all of the concerning circumstances and conditions existing when services were provided for R.M. continued to exist on the birth of S.A.M. and thereafter. (*See e.g.*, Hr'g Tr., at 7-8, 10-11, 13, 15-18, 39-40). Significantly, the record is also replete with testimony regarding Father's failure to cooperate with the Agency and his failure to take steps to ameliorate these concerning circumstances and conditions. (*See, e.g., Id.* at 17-18, 30-37).

As to Mother, clear and convincing evidence showed that she will not or cannot recognize the safety threat Father's SVP status and noncompliance with treatment poses for S.A.M., that she is not capable of standing up to Father and acting as a supervisor for Father in any event, and that she refuses to separate from Father to ensure the safety of S.A.M. The evidence also demonstrated that Mother has both physical and mental limitations and is not able, on her own, to provide for S.A.M.'s most basic needs. Mother is unable to feed or diaper the child without substantial assistance, and she does not recognize the child's communication cues. (Hr'g. Tr., at 14-16). The Agency has provided ample assistance and education to Mother (and Father), both in the past with respect to R.M. and more recently during supervised visits with S.A.M., but Mother has not shown any progress in developing competencies to meet these most basic needs of a child. (*Id.* at 14-16, 21-22, 50). These concerns regarding Mother's ability to

13

parent began in connection with R.M.'s birth and, despite ongoing provision of services, the underlying causes and conditions remain.

In sum, the Agency provided ample evidence to show repeated and continued incapacity and refusal of both Parents to take necessary steps to provide for essential parental care, control, and subsistence necessary for S.A.M.'s physical and mental well-being, and that the conditions and causes of the incapacity and refusal cannot or will not be remedied by Mother or Father. Accordingly, the Court concludes that termination of parental rights is appropriate under section 2511(a)(2).

As to section 2511(a)(5), S.A.M. was removed from Mother and Father's care and placed in a foster home after her birth approximately twenty-two months ago. As noted above, the conditions leading to removal and placement continue to exist, and Mother and Father have not availed themselves of services or followed recommendations that might conceivably help them to remedy the conditions. Given Mother and Father's history in working with the Agency, their failure to cooperate in terms of counseling and treatment for Father, the 24 hour supervision required due to Father's SVP status and noncompliance with treatment, the lack of any appropriate party to provide supervision, and Mother's refusal to separate from Father or even recognize the safety risk he poses for S.A.M., it is clear that reasonable provision of additional services and assistance is unlikely to remedy the conditions leading to placement in a realistic timeframe. It is also clear from the evidence that termination of Mother and Father's parental rights would best serve S.A.M.'s needs and welfare by freeing her for adoption and facilitating permanency for the child.

14

Finally, for the same reasons addressed above, and because more than twelve months have passed since S.A.M. was removed from Parents' home, it is evident that the requirements of section 2511(a)(8) have been met.

Having determined that section 2511(a) is satisfied, the Court turns to section 2511(b) to ascertain S.A.M.'s needs and welfare using the best interests of the child standard. The evidence demonstrated that S.A.M. is thriving in her foster placement. (Hr'g. Tr., at 56). She is physically and developmentally on track. All of her needs are met by her foster parents in terms of physical, emotional and medical needs, (id. at 23-24), and the evidence clearly showed a bond between S.A.M. and her foster parents. (Id.). She lives with her biological older sister, R.M., who was adopted by the Foster Family. The evidence also showed sibling bonds between S.A.M. and her older biological sister and her two foster siblings in the foster parents' home. (Id. at 56). Mother testified that she loves S.A.M., and the Court found this testimony to be credible. Despite her love for the child, however, Mother is clearly unable to care for S.A.M. on her own or to provide for her most basic needs, and Mother is unwilling to separate from Father to protect S.A.M. from the safety risks he poses. There are no support resources to provide supervision necessary to ensure the safety of the child if returned to Parents' care and custody. In addition to assistance from the Agency, the foster parents have facilitated contact and visits between S.A.M. and Mother and Father. Nonetheless, there was no evidence of a reciprocal bond between Mother and S.A.M. or Father and S.A.M. The Court does not believe termination of Mother and Father's parental rights would destroy an existing relationship necessary and beneficial for the child. Termination would free S.A.M. for adoption and permanency with the family that has raised her and cared for her since birth. Based on the overall evidence, the Court

15

concludes that S.A.M.'s needs and welfare are best fulfilled by terminating both Mother and Father's parental rights.

Consistent with the foregoing, the Court enters the following Order:

## ORDER

AND NOW, this ___16___ day of January, 2018, the Petition to Terminate the Parental Rights of L███ M███ and R███ E███ M███, Jr. to the minor child S.A.M. is hereby GRANTED.

BY THE COURT:

Katherine V. Oliver, Judge

Certified from the records this ___17___ day of ___January___, 20__17__

Christine M. Millinder, C.O.O.C.
Division of Common Pleas Court of
Centre County, PA

16