J-S40031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.T.-W., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.T.-W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 951 MDA 2025 |

Appeal from the Order Entered June 13, 2025
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000003-2024

| | | |
|---|---|---|
| IN RE: ADOPT. OF: J.D.T.-W., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.T.-W., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 955 MDA 2025 |

Appeal from the Order Entered June 13, 2025
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0032a

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:  **FILED: DECEMBER 29, 2025**

J.T.-W., Sr. (Father), appeals from the order granting the petition filed by the York County Office of Children, Youth, and Families (the Agency) and involuntarily terminating Father's parental rights to J.D.T.-W., Jr. (Child – a

son born in February 2021);[1] and the order changing Child's permanency goal from reunification to adoption.[2]  After careful review, we affirm.

The family came to the Agency's attention on December 22, 2023, after it received a general protective services referral alleging that Mother was homeless, and that Child was at a children's center that offers emergency respite care for children.  *See* Application for Emergency Protective Custody, 1/2/24, at 3.  Seven days later, the trial court awarded the Agency temporary protective custody of Child on an emergency basis.  *Id.* at 4.  On January 5, 2024, the trial court placed Child, along with A.C., in emergency caregiver placement with Child's maternal uncle, L.C. (foster father), and foster father's fiancée, J.W. (foster mother) (collectively, "foster parents" or "resource family").[3]

---

[1] The juvenile court also involuntarily terminated the parental rights of A.Y.C. (Mother), the mother of Child and Child's older half-sibling, A.C. (a daughter born in November 2018, who has a different biological father).  Mother is not a party to the instant appeal and filed correspondence in this Court stating that she "offers no position with regard to [Father's] appeal." Correspondence, 9/29/25.

[2] This Court *sua sponte* consolidated Father's separate appeals from the June 13, 2025, juvenile court order granting termination (951 MDA 2025) and the orphans' court's goal change order (955 MDA 2025), both of which were entered the same date, by the same judge.  Order, 8/4/25 (consolidating appeals).  For ease of reference, we refer to the lower court in each docket as "trial court."

[3] Child continued to reside with foster parents throughout the history of this case.  Foster parents are not pre-adoptive resources.

In the interim, the Agency filed a dependency petition "recommending that [] Child be adjudicated dependent and [that] Child's legal and physical custody remain with [the Agency] for continued foster care placement." Dependency Petition, 1/3/24, ¶ 21.  The dependency petition further asserted that the Agency had "received information that Father is incarcerated at York County Prison."[4]  *Id.*, ¶ 10.

On January 11, 2024, the trial court conducted a dependency hearing. Father appeared *pro se* and explained, "I've been in jail for two years."  N.T., 1/11/24, at 28.  Also present was Child's guardian *ad litem*, Christopher Moore, Esquire (the GAL).[5]  Pertinently, the Agency explained it recommended that Father complete a "threat of harm evaluation," based upon his significant criminal history, per Father's permanency plan.  *Id.* at 7.  The Agency further recommended that Father participate in parenting classes while incarcerated.

_____

[4] Father has remained incarcerated throughout the history of this case, including at the time of his June 2025 termination hearing.  *See* Trial Court Order and Opinion, 6/13/25, at 15 (observing that [Father has] "been incarcerated for a fair amount of time prior to the dependency matter beginning and has remained incarcerated throughout … the dependency matter.").  A search of Pennsylvania's inmate locator reveals that Father is currently incarcerated at the State Correctional Institution (SCI) at Fayette. https://inmatelocator.cor.pa.gov/#/Result (last visited Dec. 1, 2025).

[5] In light of Child's young age and limited verbal capacity, he offered no testimony at any proceeding throughout the history of this case.  *See* N.T. (termination hearing), 6/13/25, at 36 (testimony of Child's legal counsel, Katherine Doucette, Esquire (legal counsel), that Child was "too young to articulate his desires").

*Id.* Father confirmed he agreed with the Agency's recommendations. *Id.* at 14.

Following the dependency hearing, the trial court adjudicated Child dependent. Order, 1/11/24. The court continued the Agency's legal and physical custody of Child, who would remain in emergency caregiver placement with foster parents, and established Child's placement goal as reunification with parent or guardian. *Id.* at 2-3.

A status review hearing occurred on April 4, 2024. Father participated, with the assistance of counsel. Counsel for the Agency explained Father is incarcerated and had not requested any visits with Child, and that Child and A.C. continued to reside with foster parents and were "doing well[.]" N.T., 4/4/24, at 7. The GAL testified, "That's my understanding as well. [Child] needs nothing. To my knowledge, everything is going great in [foster parents'] home." *Id.*; *see also id.* ("I'm okay with status quo"). Father briefly testified that he had begun violence prevention and parenting classes while in prison. *Id.* at 9. Father also explained that he had pending criminal cases against him. *Id.* at 8-9. Father confirmed that he offered "no opposition to the status quo for now[,] while [F]ather works on his matters[.]" *Id.* At the conclusion of the hearing, the trial court continued Child's adjudication of dependency and placement with foster parents. *Id.* at 12.

On June 13, 2024, following a hearing, the trial court issued a permanency review order. The court found, *inter alia*, that Father remained

incarcerated, had exhibited "no compliance with [his] permanency plan," and that the Agency had made reasonable efforts to finalize the plan. Permanency Review Order, 6/13/24, at 2 (capitalization modified).

On September 26, 2024, the trial court conducted another permanency review hearing. The trial court initially took judicial notice of Father's criminal history. N.T., 9/26/24, at 7-8 (noting that Father had multiple criminal convictions, parole violations, and pending criminal charges). The Agency presented testimony from, *inter alia*, Elyse Nangle (Ms. Nangle), the Agency caseworker assigned to the family.[6] *See id.* at 26-34. Regarding parenting classes, Ms. Nangle testified that

> given [Father's] housing status right now, he can't do the parenting [classes], so [the prison is] going to try and get him on that list. [Father is] currently on protective custody [within the prison], and [the prison is] going to make accommodations to try and get him into [a parenting] class. [Father's prison] counselor also stated that unfortunately[, Father is] not a role model inmate. He has incurred five misconducts since being there as well.

*Id.* at 29. Ms. Nangle further explained Father had not completed the required threat of harm evaluation. *Id.*; *see also id.* at 33 (Ms. Nangle confirming, on cross-examination, that "as far as the threat of harm evaluation, we're just waiting for a potential release date for Father before scheduling" the

---

[6] Throughout the long history of this case, Ms. Nangle served as the family's caseworker. At the termination hearing, Ms. Nangle testified that Father had a Family Service Plan (FSP), which required him to complete parenting classes and a threat of harm evaluation. N.T., 6/3/25, at 63, 77; *see also id.*, Agency Exhibits 1-3 (Father's FSP's dated Feb. 26, 2024, Aug. 23, 2024, and Jan. 3, 2025).

evaluation, and that Ms. Nangle was "not aware of any providers that go to the prison to perform" a threat of harm evaluation (capitalization modified)). Finally, Ms. Nangle reported that Child has "been doing good in [foster parents'] home[.]" *Id.* at 31; *see also id.* at 34 (foster father testifying Child was "doing good" and that foster parents were willing and "able to continue to be a long term resource for" Child and A.C.).

On December 5, 2024, the trial court conducted another permanency review hearing, wherein Ms. Nangle provided the following update regarding Father's potential timeline for release from incarceration:

> [Father] stated to me when I last spoke with him that he would most likely be at SCI Camp Hill for six months, then he would have to go on to complete seven months at a state drug treatment program.

N.T., 12/5/24, at 16-17; *see also id.* at 17 (Ms. Nangle confirming that "the state drug treatment program would be a community-based program where [Father] might be able to participate in a threat of harm" evaluation). On the same date of the hearing, the trial court issued an order finding that Father had exhibited no compliance with his FSP goals. Order, 12/5/24.

On March 12, 2025, the Agency filed a petition to involuntarily terminate Father's parental rights to Child, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Termination Petition, 3/12/25. On the same date, the Agency filed a motion, at the dependency docket, to change Child's permanency goal from reunification to adoption, asserting the change would promote Child's best interests. Motion to Change Court-Ordered Goal,

3/12/25, at 2 (emphasizing that Father has remained incarcerated throughout the history of Child's placement, "had no visits with [Child]," and "made no progress toward alleviating the circumstances which necessitated the original placement"). The trial court scheduled a hearing (TPR hearing) for June 3, 2025, to address both the Agency's termination petition and goal change motion. Order, 3/20/25.

The TPR hearing occurred on June 3 and 13, 2025. The GAL and Child's legal counsel were present. Father appeared remotely via video from prison; his counsel attended the TPR hearing in person. At the commencement of the TPR hearing, the trial court took judicial notice of the orphans' court docket in Child's dependency case, including all filings associated therewith, with no objection by any party. N.T., 6/3/25, at 5-6, 8.

The Agency presented several witnesses at the TPR hearing, including Ms. Nangle. Ms. Nangle initially explained that Father was currently incarcerated at SCI Fayette and serving a sentence for robbery. *Id.* at 59, 63-64. Ms. Nangle testified that Child had been in placement, and deemed dependent, for approximately 17 months.[7] *Id.* at 59-60. Ms. Nangle explained Father had only two goals per his FSP, *i.e.*, complete a parenting course and a threat of harm evaluation. *Id.* at 63, 77. Ms. Nangle stated Father had failed to complete both goals, confirming that he, at no time,

_____

[7] At the time of the TPR hearing, Child was approximately four years old.

"provided any documentation to the [A]gency as to [his] participation in any type of program[.]" *Id.* at 77-78. Ms. Nangle further confirmed Father had not "made any progress in addressing the issues that caused [Child's] initial placement[.]" *Id.* at 85.

Ms. Nangle testified that Father had not participated in any visits with Child since the inception of the case. *Id.* at 71. Significantly, Ms. Nangle confirmed there had been no other form of contact between Father and Child, including via phone or mail. *Id.* at 73-74; *see also id.* at 86-87 (Ms. Nangle confirming Father sent Child no gifts or cards).

Ms. Nangle testified that she had observed interactions between Child and his resource family. *Id.* at 76. The following exchange occurred regarding Ms. Nangle's observation of these interactions at resource family's home:

Q. [Counsel for the Agency: C]an you describe the interaction between [Child and A.C.] and their current resource family?

A. [Ms. Nangle: Child and A.C.] are completely taken care of, loved. They call [foster mother] mom as well.

Q. Do they appear to be safe in the current resource home?

A. Yes.

Q. Do we have any indication that either [A.C.] or [Child] has an inability to bond with parental type figures?

A. No.

* * *

Q. And do[] the stronger parental bonds[,] as it relates to [Child,] lie with the resource family or with his biological [F]ather?

A. Resource family.

*Id.* at 76-77.

Ms. Nangle further testified that although foster parents were initially a pre-adoptive resource for Child and A.C., their status changed shortly prior to the TPR hearing. *Id.* at 99 (Ms. Nangle explaining that approximately "a month ago," foster parents notified the Agency that they "are not pre-adoptive resources any longer").[8] However, Ms. Nangle explained that other relatives of Child, who were in the courtroom, had petitioned to serve as permanent placement resources for both Child and A.C. *Id.* at 99-100, 109; *see also id.* at 100 (Ms. Nangle identifying the kinship resources as a maternal uncle (maternal uncle) and his family, who reside in the State of New Jersey).[9]

Ms. Nangle testified regarding her belief that Child's best interests would be served by terminating Father's parental rights, and changing Child's permanency goal to adoption. *Id.* at 83-84, 92. Ms. Nangle elaborated, "[Child has] been in care for 18 or so months. [Father], unfortunately, [is] not in a place to take care of [Child], physically and mentally, at this point."

_____

[8] Ms. Nangle offered no explanation as to why foster parents may have changed course, nor did foster father in his testimony at the TPR hearing.

[9] The trial court explained in its opinion that the Agency had presented evidence "that there[ are] several maternal and paternal relatives who are willing to be permanent resources for [Child and A.C.,] including … maternal [uncle]" who, Mother asserted in her TPR hearing testimony, was her preferred placement resource. Trial Court Order and Opinion, 6/13/25, at 19; *see also id.* at 19-20 (trial court observing that the "[t]estimony established that an interstate review is underway regarding [maternal uncle].").

*Id.* at 85. Ms. Nangle confirmed her belief that Child would suffer no "long-term negative impact" if Father's parental rights were terminated. *Id.* at 92-93.

> On cross-examination by Father, Ms. Nangle confirmed that
>
> as far as having the threat of harm [evaluation] completed, the [A]gency does not contract with any provider that would go to either York County Prison or any state prison to complete those evaluations.

*Id.* at 104. Ms. Nangle further stated that when she initiated phone contact with Father, he reported he had a relationship with Child prior to his incarceration. *Id.* at 103, 105; *see also id.* at 87 (Ms. Nangle acknowledging that, during some of these conversations, "[Father] asked me how his son is[.]").

Upon examination by the trial court, Ms. Nangle confirmed that (1) Father completed no parenting classes while imprisoned, *id.* at 113; and (2) there were no instances where "[Father] called, e-mailed, [or otherwise] reached out to [the Agency] on his own asking for an update" regarding Child's wellbeing. *Id.* at 114.

Father testified as his case's sole witness at the TPR hearing. Father claimed that although he had been incarcerated throughout the history of this case, prior to his incarceration, Child resided with Father and Mother, and "[Father] took care of [Child]." *Id.* at 117; *see also* N.T., 6/13/25, at 7 (Father confirming that his "current incarceration began August 27, 2022,"

- 10 -

*i.e.*, when Child was approximately 1½ years of age).  Father asserted that termination of his parental rights was inappropriate, where

> this whole situation doesn't have anything to do with me, other than I am incarcerated. …. It is not my fault [that Child] got took [*sic*].  So I am not sure why [the Agency is] trying to terminate my [parental] rights.

N.T., 6/3/25, at 120.  According to Father, he had participated in a single parenting class at York County Prison, but did not complete the course due to his transfer to state prison.  ***Id.*** at 119-20; ***see also id.*** at 123 (Father confirming for the trial court, "I never completed" a parenting course).

Father testified he anticipated being released from prison in five months, when he would be discharged to a community-based drug and alcohol treatment program.  ***Id.*** at 118, 121.  Father stated that following his completion of the three-month-long treatment program, he would then serve six months of probation, during which he would be required to participate in outpatient drug and alcohol rehabilitation.  ***Id.*** at 119.  Father asserted that following his discharge into the community, he planned to reside with his fiancée in a two-bedroom apartment located in York.  ***Id.*** at 121-22.

At the conclusion of the TPR hearing, the trial court considered the parties' respective arguments.  ***See*** N.T., 6/13/25, at 32-40. The Agency and the GAL both argued that termination of Father's parental rights, and the change of Child's permanency goal from reunification to adoption, was appropriate and served Child's best interests.  ***Id.*** at 32-35 (Agency), 35-36 (the GAL).  Child's legal counsel argued, in part, as follows:

- 11 -

> As legal counsel, I had a chance to meet with [Child and A.C.] in the resource family home on several occasions and they are both very young, energetic children. When I spoke with [A.C.], she indicated she wants to go home with [M]other. When I spoke with [Child], he is too young to articulate his desires, but through his actions, he wants to be wherever [A.C.] is.

*Id.* at 36; *see also id.* at 37 (legal counsel opining, "It's obvious that there's a very strong bond between [Child and A.C.]").[10]

The trial court also considered argument from Father's counsel, who conceded Father's incarceration throughout the case but claimed he had a relationship with Child prior to his incarceration. *Id.* at 38. Father argued his "incarceration has been a huge impediment to his ability to be a parent to [Child]." *Id.* at 38-39. Father also complained that although he

> was required to complete a threat of harm evaluation[,] … the testimony indicated that the [A]gency did not have any providers that would be willing to go out to the prison to complete the threat of harm [evaluation], which is another impediment to [Father] trying to move forward.

*Id.* at 38.

The trial court then dictated its ruling on the record. *Id.* at 41-59. The court terminated Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b); and changed Child's permanency goal from

---

[10] In her argument at the TPR hearing, legal counsel offered no opinion with regard to the Agency's termination and goal change petitions. N.T., 6/13/25, at 36-37. However, as discussed *infra*, on appeal, legal counsel argues the trial court appropriately terminated Father's rights and changed Child's permanency goal to adoption.

reunification to adoption. N.T., 6/13/25, at 41-59. The trial court concluded that

> in addition to the judicial notice taken, the incorporation of [Child's] dependency records into the [trial] court, and the exhibits that were made part of the record, the [trial] court has taken testimony from numerous witnesses [at the TPR hearing]. Based on the court's lengthy familiarity with [Child's case] …, the court finds that the Agency has met its burden by clear and convincing evidence to involuntarily terminate the parental rights of … [Father].
>
> The court further finds that the Agency has met its burden to have [Child's] court-ordered [permanency goal] change from that of reunification to that of placement for adoption, with a new concurrent goal of placement with [a] legal custodian relative.

*Id.* at 43-44 (capitalization and punctuation modified); *see also id.* at 44 ("The court will be continuing the adjudication of dependency of both [Child and A.C.]" (capitalization modified)).

Father timely filed notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements at the dependency and juvenile court dockets. On September 24, 2025, the trial court filed a Rule 1925(a) opinion, stating the court incorporated and relied upon its above-described reasoning dictated at the conclusion of the TPR hearing. This Court *sua sponte* consolidated Father's separate appeals.

Father presents the following issues for our review:

I. Whether the [trial] court erred in terminating the parental rights of Father pursuant to Sections 2511(a)(1), (2)[, ](5) and (8) of the Adoption Act?

    a. The evidence did not support by clear and convincing evidence that Father had evidenced a settled purpose of

relinquishing parental claim to [] Child or has refused or failed to perform parental duties.

b. The evidence did not support by clear and convincing evidence that [] Child was without parental care or control or that the conditions which led to the initial placement would not or could not be remedied by Father.

c. There was not clear and convincing evidence that Father could not or would not remedy the conditions which led to the initial removal.

d. There was not clear and convincing evidence that the conditions which led to the removal or placement of [] Child continued to exist and termination of parental rights would best serve the needs and welfare of [] Child.

II. Whether the [trial] court erred in concluding that termination of [Father's] parental rights would best serve the needs and welfare of [] Child pursuant to Section 2511(b) of the Adoption Act?

III. Whether the [trial] court erred or committed an abuse of discretion in changing [Child's] court[-]ordered goal from reunification to adoption?

Father's Brief at 6-7 (capitalization modified).

We are mindful of our well-settled standard of review: "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021) (citation omitted). "When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record." *In re M.E.*, 283 A.3d 820, 829 (Pa. Super. 2022) (citation omitted). We review the termination of

parental rights for an abuse of discretion. ***In the Int. of N.A.S.***, 338 A.3d 191, 196 (Pa. Super. 2025). "An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." ***Adoption of C.M.***, 255 A.3d at 359 (citation omitted).

This Court has emphasized the deferential nature of our standard of review, observing that

> [a]s the Pennsylvania Supreme Court discussed in ***In re: R.J.T.***, … 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***In the Int. of K.T.***, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets and ellipses omitted) (quoting ***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012)).

This Court has stated that

> [i]n considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.

- 15 -

*In re M.E.*, 283 A.3d at 830 (internal citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which provides for a bifurcated analysis. First, the trial court "must focus on the parent's conduct" relative to the enumerated ground for termination set forth in 23 Pa.C.S.A. § 2511(a). *In re M.E.*, 283 A.3d at 830.

> Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Id.* (internal citations and quotation marks omitted).

"[T]his Court need only agree with the [trial] court as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights." *Int. of K.T.*, 324 A.3d at 57 (citation, brackets, and internal quotation marks omitted); *see also In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (stating if the court finds grounds for termination exist under any one subsection of Section 2511(a), it must then assess the evidence relative to the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child.").

Instantly, the trial court terminated Father's parental rights to Child pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We initially address

the termination of Father's parental rights pursuant to Section 2511(a)(2), which provides as follows:

> **(a) General Rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> **(2)** The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

> To satisfy Section 2511(a)(2), a petitioner must establish
>
> (1) repeated and continued incapacity, abuse, neglect or refusal;
> (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and
> (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). "Grounds for termination pursuant to section 2511(a)(2)… 'are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.'" *In the Int. of Z.N.B.*, 327 A.3d 241, 249 (Pa. Super. 2024) (quoting *Adoption of A.H.*, 247 A.3d at 443). Subsection (a)(2) "emphasizes the child's present and future needs," as opposed to the parent's failure to perform parental duties, and thus,

> should not be read to compel courts to ignore a child's need for a stable home and strong continuous parental ties …. **This is particularly so where disruption of the family has already**

- 17 -

> **occurred and there is no reasonable prospect for reuniting it.**

*In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted; emphasis in original).

Father argues the Agency failed to sustain its burden for terminating his parental rights under subsection 2511(a)(2), where no clear and convincing evidence existed "that there was a repeated and continued incapacity, abuse, neglect or refusal of [Father] causing [Child] to be with[out] parental care." Father's Brief at 19. According to Father, "he had a relationship with [Child] prior to his incarceration and had provided [Child] with essential parental care[.]" *Id.* at 21. Father asserts that "the fundamental reason for the removal of [] Child was a result of Mother's failures and not because of any of [Father's] actions (other than being incarcerated)." *Id.* at 19-20 (capitalization and punctuation modified). Father points out his TPR hearing testimony that "he anticipated being released [from prison] within a few months of the TPR hearing." *Id.* at 21; *see also id.* (Father asserting "he could remedy the situation" that precipitated Child's placement "within a few months of [Father's] release from incarceration."). In sum, Father asserts his incarceration was the sole reason for termination of his parental rights. *See id.* at 19-20. Father cites *Adoption of S.P.*, 47 A.3d 817, *supra*, for the proposition that "incarceration neither compels nor precludes termination." Father's Brief at 20 (quoting *Adoption of S.P.*, 47 A.3d at 828 (citation omitted)).

- 18 -

In the Agency's appellate brief, which was joined by the GAL and legal counsel (collectively, Appellees), Appellees claim the trial court properly found clear and convincing grounds existed to support termination of Father's parental rights under subsection 2511(a)(2). **See** Appellees' Brief at 25-28. Appellees emphasize that Father (1) has remained incarcerated throughout the history of the case; (2) exercised no visits with Child; (3) failed to complete his FSP goals; and (4) "has not discharged any duty or obligation or otherwise formed a sustaining and meaningful relationship" with Child. **Id.** at 25; **see also id.** at 27 (pointing out that "[Father] did not complete a threat of harm evaluation, which would serve as the first step in visitation with [Child]." (capitalization and punctuation modified)).  Appellees concede that

> [i]ncarceration alone cannot constitute grounds for termination. However, the repeated failure of Father to comply with laws has created a situation that leaves [Child] without proper parental control, and this incarceration evidences a parental incapacity.

**Id.** at 25.  Appellees assert, "[a]fter over eighteen months in placement, [Child] demands, and the law requires, permanency.  While Father can wait, [Child] can[]not wait."  **Id.** at 28.

Pertinently, regarding incarcerated parents facing the involuntary termination of parental rights,

> our Supreme Court has held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." **In re Adoption of S.P.**, … 47 A.3d [at] 830 … (citation and internal quotation marks omitted). Incarceration alone is not sufficient to support termination under any subsection, but "incarceration will certainly impact a parent's

- 19 -

capability of performing parental duties, and **may** render a parent incapable of performing parental duties under subsection (a)(2)." *In re E.A.P.*, … 944 A.2d 79, 82-83 (Pa. Super. 2008) (emphasis in original).

*Int. of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*); *see also id.* ("a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." (citation omitted)).  We are also mindful that "each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind … that the child's need for consistent parental care and stability cannot be put aside or put on hold." *In the Int. of R.H.B.*, 327 A.3d 1251, 1270 (Pa. Super. 2024) (citation omitted).

> [A] parent's responsibilities are not tolled during incarceration, and[,] therefore[, the court] must inquire [into] whether the parent utilized those resources available while he or she was in prison to continue a close relationship with the child.
>
> * * *
>
> [Moreover, i]n cases involving an incarcerated parent, this Court has emphasized that a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment.

*In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008) (*en banc*) (internal citations and quotation marks omitted); *see also T.S.M.*, 71 A.3d at 269 (stating "courts must keep the ticking clock of childhood ever in mind.").

We additionally observe that

> [p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional

- 20 -

needs. Rather, a parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.

*Int. of K.M.W.*, 238 A.3d at 474 (internal citations, brackets, and quotation marks omitted).

[T]his affirmative parental duty requires continuing interest in the child and a genuine effort to maintain communication and association with the child. [P]arental duty requires that a parent exert himself to take and maintain a place of importance in the child's life[.] Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances.

*In re E.M.*, 908 A.2d 297, 305-06 (Pa. Super. 2006) (citation, ellipses, brackets, and quotation marks omitted; formatting modified).

Instantly, the trial court determined clear and convincing evidence existed to support termination of Father's parental rights under Section 2511(a), reasoning as follows:

[**Father has**] **been incarcerated for a fair amount of time prior to the dependency matter beginning and has remained incarcerated throughout the last 17 months, during the dependency matter.** ….

The court notes that, while [Father's] incarceration alone is not a basis for termination of parental rights, there's still an expectation that an incarcerated parent will do everything in his or her means to remain engaged with their child or children while incarcerated. **The court finds that** [**Father**] **has failed to do everything within his means to remain engaged with** [] **Child.** Testimony established that [Father] had begun a parenting class while at York County Prison, but did not complete a [parenting course] there prior to being transferred to SCI facilities. [Father] further testified he has not completed any parenting class while he's at any SCI facility. ….

J-S40031-25

Additionally, testimony by [Ms. Nangle] established that [Father] had received updates from [Ms. Nangle] four to five times throughout the dependency matter, when [she] initiated contact with [Father]. [Ms. Nangle's t]estimony established that [**Father**] **never proactively reached out to** [**the Agency**] **for regular updates regarding** [] **Child's overall well**[]**being** or regarding medical issues, [and Father never asked for] photos of [] Child ….

Additionally, testimony established that [**Father**] **did not provide** [**Child**] **any cards, gifts, or** [**initiate**] **other communications** … **throughout the dependency matter.**

Trial Court Order and Opinion, 6/13/25, at 15-17 (emphasis added; capitalization and punctuation modified); *see also id.* at 10 (finding that Father has not "provided any parental duties since the adjudication of dependency began on January 11, 2024.").

The trial court further observed that

[Father] confirmed that his current incarceration began on August 27[], 2022, when … [Child] was approximately one and a half years of age. [Father] was initially incarcerated at York County Prison and then ultimately transferred to the SCI system. He is currently incarcerated at SCI Fayette.

… [Father's] testimony indicated that he will remain incarcerated at SCI Fayette until at least approximately August 2025. [Father] indicated that once he is discharged from SCI Fayette, he will then need to complete a three to four-month community[-]based drug and alcohol [treatment] program through the state. [Father] further indicated that once he's successfully completed that program, he would then need to complete a 60-day inpatient rehab program. [Father] said once he completes all of those requirements, then he'll remain on probation for six months and be required to do outpatient therapy.

Based on [Father's] testimony, assuming he is fully compliant and able to be released in approximately August 2025, successfully complete[s] the anticipated three to four-month community[-]based state drug and alcohol program, and then

successfully complete[s] an additional 60-day inpatient program …, it would be at least approximately eight to nine months before he is in the community, still on probation, and engag[ing] in outpatient therapy. …. [I]t remains to be seen for certain when [Father] will be returning to the community, when he will complete a threat of harm evaluation,[11] and when he will be able to secure appropriate and safe housing for possible reunification with [] Child.

Trial Court Order and Opinion, 6/13/25, at 7-9 (footnote added; capitalization modified).

Our review confirms the trial court's analysis is supported by the record and free from legal error. The record belies Father's assertion that his incarceration was the sole basis for the termination of his parental rights. Despite his incarceration, it was Father's responsibility to make diligent efforts toward assuming his parental responsibilities, and thus, to make reasonable efforts to communicate with Child and inquire about his wellbeing. *See Int. of R.H.B.*, 327 A.3d at 1270; *In re E.M.*, 908 A.2d at 305-06 (stating that "affirmative parental duty requires continuing interest in the child and a genuine effort to maintain communication and association with the child"

---

[11] We pause to address the matter of Father's FSP goal related to completion of a threat of harm evaluation. It is undisputed that Father never completed a threat of harm evaluation. However, the evidence of record establishes that he had no way of performing the required evaluation while incarcerated. Specifically, as explained *supra*, Ms. Nangle testified that she not aware of any providers that would travel to Father's place of incarceration to perform a threat of harm evaluation. *See* N.T., 9/26/24, at 33; N.T., 6/3/25, at 77-78, 104. The record further reflects that Father's non-completion of the threat of harm evaluation may have posed an impediment to his conducting *in-person* visits with Child in prison. However, Father otherwise made no efforts to contact or communicate with Child throughout the history of this case.

"even in difficult circumstances." (citation omitted)). The record reflects Father made no "genuine effort to maintain communication and association with [Child]." *In re E.M.*, 908 A.2d at 305 (citation omitted); *see also* N.T., 6/3/25, at 73-74, 86-87 (Ms. Nangle confirming Father had made no efforts to contact Child and sent Child no gifts or cards). Father has failed to "utilize all available resources to preserve the parental relationship" with Child. *Int. of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020); *see also In re Adoption of B.G.S.*, 240 A.3d 658, 665 (Pa. Super. 2020) ("[A] parent does not perform his … parental duties by displaying a merely passive interest in the development of a child."). Father's parental "responsibilities are not tolled during [his] incarceration[.]" *Adoption of C.L.G.*, 956 A.2d at 1006 (citation omitted). Further, in light of his current incarceration, it is speculative when and if Father will ever be in a position to care for Child and provide him with safety and stability.

Based upon the foregoing, the record supports the trial court's determination that Father's repeated and continued incapacity, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for Child's physical and mental well-being. *See Adoption of A.H.*, 247 A.3d at 443. Moreover, Father cannot or will not remedy this situation. *See id.* Accordingly, the trial court did not abuse its discretion in terminating Father's parental rights under subsection 2511(a)(2). Father's first issue merits no relief.

In his second issue, Father challenges termination under Section 2511(b), asserting the Agency failed to meet its burden of establishing, by clear and convincing evidence, that termination would serve Child's best interests. *See* Father's Brief at 26-28.

> [T]he Agency did not meet its burden of … [establishing] that there was not a bond between Father and [] Child, or that it would serve the best interests of [] Child to terminate [Father's] rights and [] the existing, beneficial relationship between Father and [Child].

*Id.* at 28 (punctuation modified). According to Father, "environmental factors such as housing, income, and other [] factors played a large role in Father's perceived failures to parent [Child]." *Id.* at 27-28.

Appellees counter clear and convincing evidence established that termination of Father's parental rights was appropriate pursuant to Section 2511(b), and served Child's best interests. *See* Appellees' Brief at 27-28.

> [Child] is doing well in the resource [family] setting and has adjusted well. There was no evidence whatsoever[] that Father is engaged [with], or was even aware[] of[,] the needs of [Child,] including, but not limited to, [Child's] progress and development academically, mentally, socially, or athletically. [Child] requires and demands permanency; Father can[]not provide this.

*Id.* at 27. Appellees argue the trial court "properly weighed the bond, or lack thereof, that [Child] has with his Father but concluded, correctly, the best interest of [Child] would be served [by] termination of Father's parental rights." *Id.*

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare under Section 2511(b), which provides, in relevant part, as follows:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. ….

23 Pa.C.S.A. § 2511(b).

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." **Int. of K.T.**, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id.** (citation omitted); **see also In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010) (explaining that a trial court's analysis of the bond between a parent and a child under Section 2511(b) neither requires expert testimony nor a "formal bonding evaluation[,]" but rather, permits "[s]ocial workers and caseworkers [to] offer evaluations as well." (citations omitted)). However, "the parental bond is but one part of the overall subsection (b) analysis." **Int. of K.T.**, 296 A.3d at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether

- 26 -

the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.* (footnote and citations omitted);

Instantly, the trial court opined that clear and convincing evidence established that termination served Child's best interests under Section 2511(b), where no bond existed between Father and Child:

The court finds that the strongest parental bond for [Child] is with his current [foster] parents. It's been several years since [Child has] had any direct contact with … [Father]. The court finds that no parental bond exists between [Child and Father].

Trial Court Order and Opinion, 6/13/25, at 18 (capitalization modified). The court additionally found that

termination of [Father's] rights will have no long-term negative impact on [Child]. The [trial court] finds that … [Father has not] made appropriate progress to alleviate the circumstances which necessitated [Child's] adjudication of dependency 17 months ago[.]

*Id.* at 19. The court found that termination "best serves the needs and welfare of [Child] and will allow [Child] to move forward and achieve permanency."

*Id.* at 20.

Our review confirms the trial court's reasoning is supported by clear and convincing evidence of record, and we agree with its determination. It is established that "[i]n cases where there is no evidence of any bond between the parent and the child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Here, no evidence exists of any bond between Child and Father. Trial Court Order and Opinion, 6/13/25,

- 27 -

at 18. Indeed, Father does not claim he shares any bond with Child; instead, he cursorily challenges the Agency's purported failure to establish the **absence** of a bond. Father's Brief at 28.

Moreover, Ms. Nangle – who was very familiar with Child, having served as the caseworker throughout the case – testified that (1) in foster parents' home, Child was "completely taken care of[ and] loved," N.T., 6/3/25, at 76; (2) Child exhibited "stronger parental bonds" with foster parents than he did with Father, *id.* at 77; (3) termination of Father's parental rights would promote Child's best interests, *id.* at 83-84, 92; and (4) Child would suffer no "long-term negative impact" if Father's rights were terminated. *Id.* at 92-93. Child deserves permanency, and at the time of the TPR hearing, had resided with foster parents for over 17 months,[12] nearly half of his young life. *Int. of K.T.*, 296 A.3d at 1113; *see also In re: T.S.M.*, 71 A.3d at 269 ("Children are young for a scant number of years and we have an obligation to see their health development quickly." (citation omitted)).

Based upon the foregoing, we discern no error or abuse of the trial court's discretion in determining that Child's best interests were served by

---

[12] Although foster parents, for reasons unclear, are no longer pre-adoptive resources for Child, other kinship resources have petitioned to serve as permanent placement resources for both Child and A.C. **See** Trial Court Order and Opinion, 6/13/25, at 19-20; N.T., 6/3/25, at 99-100, 109. Moreover, it is established that "the Juvenile Act does not require pre-adoptive placement as a precondition to termination of parental rights[.]" **In re T.D.**, 949 A.2d 910, 922 (Pa. Super. 2008).

terminating Father's parental rights under Section 2511(b). Father's second issue merits no relief.

In his final issue, Father briefly asserts the trial court abused its discretion by changing Child's permanency goal from reunification to adoption. ***See*** Father's Brief at 29-30. However, Father acknowledges, in candor, that "the issue of a change in the goal … becomes moot [] if this [] Court determines that … termination of his parental rights was appropriate." ***Id.*** at 29 (citations omitted). We determine that Father's final issue is moot based upon our affirmance of the termination of Father's parental rights. ***See In the Int. of A.R.***, 311 A.3d 1105, 1114 (Pa. Super. 2023) (stating that the affirmance of termination of parental rights "necessarily renders moot the dependency court's decision to change [c]hild's goal to adoption." (quoting ***Adoption of A.H.***, 247 A.3d at 446)).

Accordingly, we affirm the order involuntarily terminating Father's parental rights to Child, and the order changing Child's permanency goal from reunification to adoption.

Orders affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/29/2025